No. 00-709

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 216

EUGENE F. HUGHES, JR., M.D.,

Plaintiff and Appellant,

v.

JOHN PULLMAN, M.D., W. BRUCE ELLIS, M.D.,

CINDY S. EDSTROM, M.D., J. MICHAEL DRISCOLL,

M.D., MICHAEL J. RAMIREZ, and MONTANA

PROFESSIONAL ASSISTANCE PROGRAM, INC.,

a Montana non-profit corporation,

Defendants and Respondents.

APPEAL FROM: District Court of the Second Judicial District,

In and for the County of Silver Bow,

Honorable James Purcell, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Bill Hanson, Bill Hanson, Attorney PLLC, Bozeman, Montana

For Respondents:

Gregory G. Murphy, Moulton, Bellingham, Longo & Mather, P.C.,

Billings, Montana (For Pullman, Ellis, Edstrom and Driscoll)

Barry G. O'Connell, Moore, O'Connell & Refling, P.C., Bozeman

Montana (For Ramirez and Montana Professional Assistance Program)

Submitted on Briefs: February 16, 2001
Decided: November 1, 2001

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Eugene F. Hughes, Jr., brought this action against defendants for false imprisonment, civil conspiracy, breach of contract and civil rights violations. The United States District Court granted defendants' Motion for Summary Judgment as to the civil rights claims and remanded the remaining state law claims to the Second Judicial District, Silver Bow County. That court granted defendants' Motion for Summary Judgment on the remaining issues. Hughes appeals. We affirm.

¶2 We address the following issues on appeal:

¶3 1. Whether the District Court improperly dismissed Hughes's false imprisonment and civil conspiracy claims when it found that Hughes voluntarily checked himself into the Sante Center for Healing and the Menninger Clinic.

¶4 2. Whether Defendants waived the privilege from mandatory disclosure through discovery by relying on the qualified immunity from liability granted by state "peer review privileges" or, in the alternative, whether Montana's "peer review privilege" against

discovery is an unconstitutional taking of Hughes's property or impairment of his right to contract.

¶5 3. Whether the District Court incorrectly concluded that the Medical Staff Bylaws did not create a contract among the participants in the peer review process.

¶6 4. Whether the District Court erred by addressing the question of whether the contracts between Hughes and MPAP were valid?

¶7 5. Whether the District Court improperly denied Hughes's Motion to File a Supplemental Complaint.

Facts and Procedural History

¶8 From September 1997 through February 1998, Doctors Hughes, Pullman, Ellis, Edstrom and Driscoll were all active members of the medical staff of St. James Community Hospital in Butte (the Hospital). Dr. Hughes was a radiation oncologist at the Hospital. During 1997, Dr. Pullman was president of the medical staff and chief medical officer. Dr. Ellis was president of the medical staff in 1998. Dr. Edstrom was chief of pediatric medicine, and Dr. Driscoll was chief of radiology. Doctors Pullman, Ellis, Edstrom and Driscoll all served on the medical Executive Committee of the hospital.

¶9 In the fall of 1997, Hughes advised a female patient with inflammatory breast cancer that her prognosis of survival beyond five years was not good. After receiving advice from Hughes, the patient agreed to be treated with therapeutic radiology by Hughes. Prior to radiation, a radiation oncologist makes specific marks on the affected area to identify where to direct radiation beams. Hughes received consent from the patient to make these types of marks on her affected breast. In addition to the marks directing radiation beams, Hughes drew a smiley face on the woman's breast by drawing two dime sized "eyes" above the nipple of the breast and outlining the scar from the breast biopsy for the "mouth."

¶10 The patient complained to hospital administration, and it forwarded the complaint to defendant Pullman. Pullman appointed Ellis, Edstrom and Driscoll to an ad hoc committee to investigate the complaint. After investigation, the ad hoc committee reported to the Executive Committee and that Committee adopted the recommendations of the ad hoc committee that Hughes receive a letter of reprimand, have a term of probation and have a

chaperone while he worked. Additionally, the Executive Committee recommended that Hughes be evaluated by Montana Professional Assistance Program (MPAP).

¶11 On December 23, 1997, Hughes met with Pullman and Defendant Michael J. Ramirez, the clinical coordinator of MPAP. At that time, Hughes signed an MPAP Evaluation/Treatment Agreement in which he agreed to undergo a medical, psychiatric and/or chemical dependency evaluation at a facility approved by MPAP and to abide by all treatment recommendations made by the facility. Hughes alleges that he signed the agreement under duress, believing that if he did not sign, Pullman would place him on summary suspension and Ramirez would cause the State Board of Medical Examiners to revoke his license to practice medicine.

¶12 On December 26, 1997, Hughes flew his plane to Texas and checked himself into the Sante Center for Healing for an evaluation. After the evaluation was completed, he returned to Montana. In early January, he flew himself to the Menninger Clinic in Topeka, Kansas, for treatment.

¶13 After his release from the Menninger Clinic and return to Montana, Hughes signed an MPAP Aftercare Agreement. He alleges that he feared that if he did not agree to aftercare, Ramirez would initiate a license revocation proceeding with the State Board of Medical Examiners.

¶14 Hughes commenced this action in the Montana Second Judicial District Court, Silver Bow County. The case was transferred to the United States District Court for the District of Montana due to Hughes's federal civil rights claims.

¶15 The United States District Court held that the Montana peer review statute foreclosed the direct discovery of information from the participants in the peer review process. In February, 2000, the federal court entered summary judgment for the Defendants on the federal civil rights claims and remanded the case back to state court.

¶16 The state court heard arguments on motions for summary judgment, and in August, 2000, filed its order granting the Defendants' motions for summary judgment and dismissing all of the state law claims. This appeal followed.

## Discussion

¶17 Did the District Court improperly dismiss Hughes's false imprisonment and civil conspiracy claims when it found that Hughes voluntarily checked himself into the Sante Center for Healing and the Menninger Clinic?

¶18 On appeal, Hughes argues that the District Court improperly decided a material issue of fact when it found that his actions were voluntary. He argues that he produced uncontroverted evidence that he signed the agreements and submitted to evaluation and treatment only because of the threats made by Pullman and Ramirez; that they had no good cause to threaten summary suspension and license revocation; and that a summary suspension would irreparably hurt his reputation.

¶19 The District Court held that there was no issue of material fact surrounding the voluntary nature of Hughes's actions. It found that Hughes signed both MPAP agreements voluntarily and his admission into the Sante Center and Menninger Clinic was voluntary. The court also concluded that although Hughes faced suspension if he refused to sign the agreements, the threatened suspension was a result of his own violations of the Hospital's ethical and religious directives and not attributable to unlawful actions by Pullman and Ramirez.

¶20 This Court reviews a summary judgment ruling *de novo*. *Axtell v. M.S. Consulting*, 1998 MT 64, ¶ 21, 288 Mont. 150, ¶ 21, 955 P.2d 1362, ¶ 21. Rule 56(c), M.R.Civ.P., provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The purpose of summary judgment is to eliminate the burden and expense of unnecessary trials. *Klock v. Town of Cascade* (1997), 284 Mont. 167, 173, 943 P.2d 1262, 1266.

¶21 The gravamen of a false imprisonment claim is the deprivation of liberty of movement or freedom to remain in the place of one's lawful choice. The two elements of false imprisonment are the restraint of an individual against his will and the unlawfulness of such restraint. *Hardy v. LaBelle's Distributing Co.* (1983), 203 Mont. 263, 265, 661 P.2d 35, 37. The restraint must be involuntary. The individual may be restrained by acts or merely by words which he fears to disregard. *Hardy*, 203 Mont. at 265, 661 P.2d at 37. However, there is no imprisonment if the plaintiff agrees of his own free choice to act in conformity with the request of the defendant. *Mitchell v. Lowe's Home Centers, Inc.* (Ga. Ct. App. 1998), 506 S.E.2d 381, 384.

¶22 We agree with the District Court that there was no genuine issue of material fact concerning the voluntariness of Hughes's actions. The undisputed facts show that Hughes met with Pullman and Ramirez on December 23, 1997, and signed an MPAP Evaluation/ Treatment Agreement in which he agreed to undergo evaluation and treatment. On December 26, he flew himself to Texas and checked himself into the Sante Center for evaluation. On January 8, he checked himself into the Menninger Clinic in Kansas and signed an application for admission as a voluntary patient and a form outlining the rules and procedures relating to the discharge of voluntary patients. He remained at the Menninger Clinic until his treatment was completed, although he was aware he could leave.

¶23 Hughes relies on a theory of economic duress to show that his actions were not voluntary but were coerced. We have set forth the three elements of economic duress as: 1) a wrongful act that; 2) overcomes the will of a person; 3) who has no adequate legal remedy to protect his interests. *Hoven v. First Bank (N.A.)-Billings* (1990), 244 Mont. 229, 234, 797 P.2d 915, 919. "A claim of economic duress requires a showing that the contract at issue was made under circumstances evincing a lack of free will on the part of the contracting parties. It is not sufficient to show that consent was secured by the pressure of financial circumstances." *Hoven*, 244 Mont. at 235, 797 P.2d at 919.

¶24 The uncontroverted facts show that Hughes did have an adequate legal remedy. The Medical Staff Bylaws provided a hearing in the event that Hughes was suspended. He could have refused to obtain the evaluation and treatment recommended by MPAP. At that point, if Pullman had suspended him, he would have been entitled to a hearing under Article VIII Part B of the Bylaws. Additionally, under § 37-3-401(2)(b), MCA, MPAP is required to report to the Board of Examiners "the identity of a licensee . . . if the licensee fails or refuses to comply with a reasonable request that the licensee undergo a mental, physical, or chemical dependency evaluation." Although Ramirez would have been statutorily required to refer Hughes to the Board of Examiners, the complaints against him would have been investigated pursuant to statute and a hearing held before any disciplinary action against him could have been imposed. Hughes had a legal remedy. He chose a different course of action. He chose to comply. He cannot now claim coercion.

¶25 We hold that the District Court correctly concluded that no material facts exist as to the voluntariness of Hughes's action, therefore his false imprisonment claim fails as a matter of law. We also conclude that Hughes's civil conspiracy claim must fail.

¶26 To sustain a civil conspiracy action, a plaintiff must allege a tort committed by one of the alleged conspirators. *Duffy v. Butte Teachers' Union* (1975), 168 Mont. 246, 252, 541 P.2d 1199, 1202. Here, because Hughes's false imprisonment claim fails, there is no underlying tort action forming a basis for civil conspiracy. We hold that the District Court correctly dismissed this claim.

¶27 Did Defendants waive the privilege from mandatory disclosure through discovery by relying on the qualified immunity from liability granted by state "peer review privileges" or, in the alternative, is Montana's "peer review privilege" against discovery an unconstitutional taking of Hughes's property or impairment of his right to contract?

¶28 The United States District Court concluded that the Montana peer review statute foreclosed the direct discovery of information from the participants in the peer review process. The statute provides:

> (1) No member of . . . a peer review committee . . . is liable in damages to any person for any action taken or recommendation made within the scope of the functions of the committee if . . . the member acts without malice and in the reasonable belief that the action or recommendation is warranted by the facts known to him after reasonable effort to obtain the facts of the matter for which the action is taken or a recommendation is made.

> (2) The proceedings and records of . . . peer review . . . committees are not subject to discovery or introduction into evidence in any proceedings. However, information otherwise discoverable or admissible from an original source is not to be construed as immune from discovery . . . merely because it was presented during proceedings before the committee.

Section 37-2-201, MCA.

¶29 Hughes argues that the Defendants cannot invoke the immunity offered in subsection 1 without waiving the privilege against discovery found in subsection 2. He seeks to admit evidence that the ad hoc committee purportedly relied on in its recommendations to the executive committee. Regardless of what the proposed evidence might be, the workings of the ad hoc committee are not relevant to the determination that Hughes's actions were voluntary; therefore, we do not reach the issue of waiver of the discovery privilege.

¶30 Hughes also argues that the peer review privilege is an unconstitutional taking of his property or impairment of his right to contract. This Court will not rule on the constitutionality of a statute if we can decide a case without addressing constitutional concerns. *S.L.H. v. State Comp. Mutual Ins. Fund*, 2000 MT 362, ¶ 14, 303 Mont. 364, ¶ 14, 15 P.3d 948, ¶ 14. Evidence from the peer review committee is not necessary to decide the issue of voluntariness; therefore, we decline to address Hughes's constitutional argument.

¶31 Did the District Court incorrectly conclude that the Medical Staff Bylaws did not create a contract among the participants in the peer review process?

¶32 Hughes argues that the Medical Staff Bylaws created a contract between Hughes and the doctors participating in the peer review process and that the contract was breached when the doctors failed to follow the procedure laid out in the Bylaws.

¶33 He cites several out of state cases that assert the majority view that hospital bylaws, when approved and adopted by the governing board, become a binding and enforceable contract between the hospital and physicians on the medical staff. *See Lawler v. Eugene Wuesthoff Mem. Hospital Assn.* (Fla. Dist. Ct. App. 1986), 497 So.2d 1261, 1264. However, he cites to no authority that the bylaws create a contract between an individual physician and other physicians participating in the peer review process.

¶34 Indeed, the analysis in cases holding that the bylaws create a contract between a physician and the hospital does not support a finding that a contract is created between participating physicians. These cases focus on the presence or lack of consideration between the hospital and the physician. Some courts have found no consideration, based on the fact that the hospital had a pre-existing statutory duty to create bylaws and consideration cannot be a promise to do something which the promisor is already obligated to do. *See Robles v. Humana Hospital, Cartersville* (N.D. Ga. 1992), 785 F. Supp. 989, 1001. Other courts have found valid consideration in the fact that both the hospital and the physician have agreed to do something they were previously not bound to: i.e., the hospital has agreed to extend privileges to the physician and the physician has agreed to abide by the bylaws. *Gianetti v. Norwalk Hosp.* (Conn. 1989), 557 A.2d 1249, 1255.

¶35 The question in this case concerns whether the Bylaws create a contract between Hughes and the physicians serving on the ad hoc committee. Whether there is

consideration between the Hospital and Hughes is immaterial; there is clearly no consideration between Hughes and the doctor Defendants. We hold that the District Court correctly held, as a matter of law, the Bylaws do not create a contract between Hughes and the physicians participating on the ad hoc committee.

¶36 Did the District Court err by addressing the question of whether the contracts between Hughes and MPAP were valid?

¶37 Despite the fact that both MPAP and Hughes agreed at oral argument that Hughes's claim for declaratory relief was moot, the District Court noted that "[i]t is the opinion of the Court that both Hughes and MPAP should abide by the agreements." Both parties also agree on appeal that this issue is moot.

¶38 The parties agreed that the contract between MPAP and Hughes was no longer valid, therefore there was no actual controversy on this issue. We hold that the District Court erred in addressing the validity of the contract.

¶39 Did the District Court improperly deny Hughes's Motion to File a Supplemental Complaint?

¶40 We review a district court's denial of a motion to file a supplemental pleading for an abuse of discretion. *First Security Bank of Missoula v. Ranch Recovery Ltd.,* 1999 MT 43, ¶ 24, 293 Mont. 363, ¶ 24, 976 P.2d 956, ¶ 24.

¶41 Rule 15(d), M.R.Civ.P., provides that the district court "may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."

¶42 Although Rule 15 generally favors allowing amendments, we have held that "a trial court is justified in denying a motion for an apparent reason such as undue delay, bad faith . . . and futility of the amendment." *Lindey's Inc. v. Professional Consultants, Inc.* (1990), 244 Mont. 238, 242, 797 P.2d 920, 923.

¶43 In its Pre-Trial Order, the United States District Court set April 4, 1999, as the deadline for amendments to the pleadings. Defendants filed motions for summary judgment in August, 1999. On October 7, 1999, the Hospital revoked Hughes's privileges.

In January, 2000, at the hearing on summary judgment, Hughes announced his intention to file a supplemental complaint for tortious interference with prospective business advantage. He filed the motion on January 24, 2000.

¶44 Hughes argues that his supplemental claim did not arise until October, when the hospital revoked his privileges. He argues that the revocation of his privileges was the result of Defendants' tortious conduct which is also the basis for the claims in his original complaint. Defendants argue that Hughes's motion was untimely, in that it was filed some nine months after the deadline for amendments set by the federal court and over three months after the alleged revocation of privileges.

¶45 In light of the fact that the deadline for amendments had passed, summary judgment motions were pending, and Hughes waited three months after the revocation, we conclude that the District Court did not abuse its discretion in denying the motion to supplement the complaint.

¶46 The District Court is affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ PATRICIA COTTER

/S/ TERRY N. TRIEWEILER