CHIEF JUSTICE McGRATH
delivered the Opinion of the Court.
¶1 Leah Gonzales appeals from the July 30, 2008, orders of the District Court of the Eighteenth Judicial District Court, Gallatin County, granting summary judgment to the defendants. We affirm.
¶2 Gonzales raises several issues on appeal that we restate as follows:
¶3 Issue One: Whether the District Court properly concluded that the public duty doctrine bars Gonzales’ claims.
¶4 Issue Two: Whether Gonzales was unlawfully arrested.
PROCEDURAL AND FACTUAL BACKGROUND
¶5 On the evening of April 3, 2005, Gonzales was the lone clerk at a Town Pump store on East Main Street in Bozeman, Montana. At 9:55 p.m. a man later identified as transient Jose Mario Gonzalez-Menjivar entered the store wearing a ski cap. He held a knife to Gonzales’ throat and demanded money. Gonzales was able to surreptitiously dial 911 on her cell phone shortly after Menjivar entered the store but could not talk to anyone and never knew whether the call went through. In the meanwhile, Gonzales began removing money from the safe, which was limited by a security device to dispensing $100 every two or three minutes.
¶6 Gonzales’ 911 call did go through to Gallatin County dispatch, and *147 dispatchers heard enough on the open line to understand that there was a robbery in progress somewhere. Dispatch notified Bozeman Police that there was a robbery in progress somewhere in the city, and officers began checking open businesses. Meanwhile, dispatchers worked quickly to identify the location of the robbery. They used a law enforcement database called I/LEADS to determine that the call had been made from a cell phone number registered to Gonzales, and that her last known employment was a Town Pump. The system gave the telephone number of the Town Pump store where Gonzales was last known to work, but not its address. Dispatcher Pickering used a phone book to match the phone number in the I/LEADS system to the Town Pump on East Main Street. She “screamed it’s the East Main Town Pump, turned around and high-fived the chaplain”and notified officers of the probable location of the crime.
¶7 Officers responded to the East Main Town Pump and saw that the business was dark and appeared to be closed. Sgt. Megargel directed responding officers to begin establishing a perimeter around the building. An officer approached the building and determined that one of the doors was unlocked and then retreated, while other Bozeman Police and Gallatin County Sheriffs Department officers arrived. Officers approached the building again, saw a man inside wearing a hooded sweatshirt, and then withdrew to the perimeter. Officers saw shadowy figures of two people inside the store.
¶8 In the meanwhile, Menjivar had picked up Gonzales’ cell phone from the counter and closed it, cutting off the connection with the dispatchers. Their calls back to Gonzales’ cell phone were not answered. Dispatchers called the land line for the Town Pump store, and when the phone rang Menjivar picked it up, inadvertently pressed a “talk” command and placed the phone in his pocket. This left the line open. Dispatchers discerned a male and a female voice, but had difficulty hearing what was happening because the phone was in Menjivar’s pocket.
¶9 At 10:12, Menjivar forced Gonzales into a restroom and during the next four minutes, raped her. Neither the dispatchers nor the officers at the scene knew that'this was happening. The dispatchers testified that they would have immediately notified the officers if there had been any indication that Gonzales was being raped.
¶10 Sgt. Megargel believed that there could be a barricaded suspect with a hostage in the Town Pump. He requested a K-9 dog team and special response team. Menjivar and Gonzales left the bathroom and Gonzales continued to obtain money from the safe. The officers had not *148 yet announced their presence at the scene. During the event Menjivar repeatedly threatened Gonzales with death and continued to hold a knife on her.
¶11 During these events the responding officers knew there were two people in the Town Pump but never knew whether there were more than two. From time to time they could see “shadows moving” in the dark building. Dispatch informed officers that there was a transient camp near the store and that persons from the camp could be inside the store. Officers investigated another report of a person moving on foot through the area who turned out to be a jogger. Officers did not know how many perpetrators or victims were involved or how any perpetrators were armed.
¶12 Menjivar left the store at 10:28 and was immediately arrested outside. Officers then shouted commands demanding that anyone else in the store come out. The deputy with the K-9 dog gave commands for anyone inside to come out or he would release the dog. Gonzales then came out of the store barefoot and wearing a Town Pump apron. She testified that officers directed her to show her hands and to lie on the ground and that she complied. Officer Kaycee Anderson, one of the defendants, handcuffed Gonzales and performed a pat-down search during which Gonzales said that she had been raped. Anderson immediately got Gonzales to her feet and walked her to a safe location at a police car and removed the handcuffs. Anderson asked Gonzales if she needed an ambulance, and Gonzales said that she did not because she was not hurt. Anderson drove Gonzales to the hospital for treatment. Gonzales confirmed Anderson’s description of these events and testified that she was on the ground in handcuffs for about 30 seconds. Neither Menjivar nor Gonzales knew that law enforcement officers were on the scene prior to leaving the store.
¶13 While Anderson was dealing with Gonzales officers were moving in to secure the building, giving commands for anyone else to come out of the store. They secured the building without finding anyone else inside. Officers did not know that Gonzales had been raped until she came out and told Anderson.
¶14 Officers did not know that Gonzales was the female voice that had been heard by dispatchers in the store until she came out and was identified by Anderson based upon a prior contact. Anderson knew from the prior contact that Gonzales was pregnant, but there was no evidence that any of the other officers knew this or that they could determine the pregnancy from Gonzales’ appearance.
¶15 While Officer Anderson suspected when Gonzales came out that *149 she was the clerk in the store, officers could not immediately confirm this and the building was not yet secured. Sgt. Megargel explained why the officers at the scene could not assume that Gonzales was the victim in sole reliance on the information from dispatch that they had heard two voices:
Based on my training and experience in my almost 13 years of law enforcement, I could see why-we can’t make assumptions. I mean, that what they told us that there was. But until I see what there is and until I know what there is, you know, I could assume in the back of my mind that the information is accurate and correct, but I would be doing myself an injustice to assume that there was only two people, and one male and one female. That would put me at risk, that would put my shift at risk, that would put the citizens at risk, it would put the victim at risk and it will put the suspect at risk. We didn’t assume anything.
Therefore, they secured Gonzales and confirmed her identity and status as quickly as possible (about 30 seconds) after she came out of the store.
¶16 Gonzales sued Bozeman and Gallatin County law enforcement agencies, several officers individually, and Town Pump. The government defendants removed the action to United States District Court, where the court granted their motions for summary judgment and dismissed all of the claims brought under 42 U.S.C. § 1983. Gonzales then re-filed the action in state court and settled with Town Pump. The District Court granted summary judgment to the Bozeman and Gallatin County defendants and Gonzales appeals.
¶17 Menjivar was charged with and pled guilty to rape, robbery and aggravated kidnapping. In March, 2006, he was sentenced to a term of 180 years in the Montana State Prison.
STANDARD OF REVIEW
¶18 This Court reviews de novo a district court’s decisions on summary judgment, applying the same criteria as the district court, found in M. R. Civ. P. 56. Watson v. Dundas, 2006 MT 104, ¶ 16, 332 Mont. 164, 136 P.3d 973.
DISCUSSION
¶19 Gonzales claims that the Bozeman and Gallatin County defendants negligently responded to the situation at the Town Pump, allowing Menjivar to rape her and that they then improperly arrested her when she came out of the store. A negligence claim depends upon *150 establishment of a legal duty on the part of the defendant, breach of that duty, causation, and damages. Lopez v. Great Falls Pre-Release Services, 1999 MT 199, ¶ 18, 295 Mont. 416, 986 P.2d 1081. Determination of the existence of a duty is an issue of law. Lopez, ¶ 31.
¶20 The issue here is whether the Bozeman and Gallatin County defendants owed a duty to the plaintiff while responding to the situation at the Town Pump. The District Court held that they had no duty. The general rule, often called the public duty doctrine, is that a law enforcement officer has no duty to protect a particular person absent a special relationship because the officer’s duty to protect and preserve the peace is owed to the public at large and not to individual members of the public. Nelson v. Driscoll, 1999 MT 193, ¶ 21, 295 Mont. 363, 983 P.2d 972; Eves v. Anaconda-Deer Lodge County, 2005 MT 157, ¶ 9, 327 Mont. 437, 114 P.3d 1037. Despite the public duty doctrine, a government officer may have an actionable duty to a particular individual if the officer is in a “special relationship” with that individual. There are four recognized situations in which a special relationship has been found: (1) where a statute intended to protect a specific class of persons from a particular type of harm imposes a duty; (2) where the government agent undertakes a specific action to protect a person or property; (3) where government action reasonably induces detrimental reliance by a member of the public; and (4) where the government has actual custody of the plaintiff or of a third person who harms the plaintiff. Nelson, ¶ 22.
¶21 While not expressly decided under the public duty doctrine, other decisions from this Court have considered whether there is a duty to protect when a governmental agent has actual custody of the plaintiff or of a third person who harms the plaintiff. Lopez; LaTray v. City of Havre, 2000 MT 119, 299 Mont. 449, 999 P.2d 1010; Prindle v. Ravalli County, 2006 MT 62, 331 Mont. 338, 133 P.3d 165. In Prindle this Court noted the “obvious similarity” between these cases and the public duty doctrine and that it may be appropriate fin the future” to “weave these parallel strands of authority together.” Prindle, ¶ 26. We do so now. The decisions in Lopez, LaTray and Prindle all involve application of the fourth “special relationship” exception to the public duty doctrine identified in Nelson. As stated in Nelson, a duty may arise as an exception to the public duty doctrine when the governmental agent ‘has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.” Nelson, ¶ 22. Therefore, the decisions in Lopez, LaTray and Prindle should not be regarded as a separate line of authority to be applied in addition to the public duty *151 doctrine. Rather, those decisions should be regarded as applicable to the issue of whether there is a custody or control exception to the public duty doctrine.
¶22 The District Court below held that the public duty doctrine applied to the claims against the City of Bozeman, Gallatin County and the individual officer defendants. The District Court also found that none of the Nelson special relationship exceptions applied and that therefore the defendants owed no duty to protect Gonzales from Menjivar.
¶23 Gonzales’ arguments on appeal emphasize applicability of the fourth Nelson exception, which arises when the government has actual custody or control of the plaintiff or a third person who harms the plaintiff. This exception arises, in part, from the Restatement (Second) Torts, §319, which provides:
One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.
Before that section and the exception apply, the officer must take charge of the third person. We have held that an officer takes charge under §319 "when the police officer takes a person into custody, or exerts some legal or physical restraint on his or her liberty.” Nelson, ¶ 28.
¶24 The cases relied upon by Gonzales do not assist her argument that she is entitled to application of Nelson’s fourth exception to the public duty doctrine because they are each distinguishable. In Lopez, the convict who injured the plaintiff was under the express authority and control of the Pre-Release Center that failed to track his whereabouts after he walked away. In LaTray the officers had actual physical custody of the third party who harmed the plaintiff, and that party was assisting the officers in removing a prisoner from a police car at the time of the assault. In Prindle a court order required the county to take custody of and incarcerate a convicted individual who was turned away by jailers when he tried to surrender to serve time. That individual harmed the plaintiff during the time he should have been in jail.
¶25 It is clear under the facts of this case that the defendants never had custody or control of Menjivar until he came out of the Town Pump and was placed under arrest. Furthermore, it is only speculation that responding officers could have reasonably and safely arrested Menjivar before he raped Gonzales, an incident that occurred only minutes after *152 the initial arrival of officers at the scene. Because of the quick and accurate investigative work done by the dispatchers, the initial responding officers arrived at the store about six minutes after Menjivar entered. The store was dark inside and the door was not locked. They did not know who was inside or how many people were involved. They had no information about the weapons involved and had no way to determine in that time what reaction they would provoke by confronting those inside or forcibly entering the building. Contrary to Gonzales’ assertion in her brief, the officers did not watch and listen while she was raped. The officers’ perimeter around the building was not custody or control of either Menjivar or Gonzales, but was only a step in attempting to assert custody or control of those inside the Town Pump. A hostage or captive like Gonzales is not in the control of responding officers, but of the criminal holding her. Kepner v. Houstoun, 164 F. Supp. 2d 494, 500 (E.D. Pa. 2001).
¶26 Therefore, we conclude as a matter of law that the responding officers did not have custody or control of either Gonzales or Menjivar at the time the rape occurred. They did not have custody or control of Menjivar until he came out of the store and officers placed him under arrest.
¶27 Gonzales also argues, briefly, that other Nelson special relationship exceptions to the public duty doctrine should be applied. She argues that the defendants undertook specific action to protect her by responding to the Town Pump. The officers responding to the situation at the Town Pump were there to intervene in a possible robbery. Their identification of Gonzales as a victim and their understanding of her relationship to the events did not come about until she came out of the building and her role and identity were established. While dispatchers had determined that the initial cell phone call to 911 was placed from a number registered to Gonzales, they could not confirm that Gonzales herself was using the phone or that she had placed the call.
¶28 In Eves this Court found that undertaking efforts to find an identified missing person did not support a special relationship exception to the public duty doctrine. In Kepner the Court expressed the principle that law enforcement officers have no duty to rescue based upon knowing about a person’s situation or even expressing intent to help. Kepner, 164 F. Supp. 2d at 498. In Nelson a duty arose because the officers personally dealt with the decedent and undertook affirmative steps to keep her from driving her vehicle because they believed that she was too intoxicated to do so safely. By contrast, the *153 officers here were in no position to undertake specific actions to protect Gonzales until she came out of the store and her identity and role in the events were established. The facts here do not support application of the Nelson exception to the public duty doctrine that applies when officers undertake specific action to protect a person.
¶29 Gonzales also argues that she was reasonably induced to detrimentally rely on law enforcement officers. The facts adduced in the District Court do not support her argument. Gonzales did not know whether her attempt to call 911 had been successful and did not know that law enforcement officers had been dispatched to the store. She did not know that law enforcement officers had a perimeter around the store. The only action she could possibly have taken in reliance upon actions of the officers was to eventually come out of the store. After Menjivar’s arrest, she clearly had to leave the store so that officers could secure the crime scene and so that she could get medical attention. The officers were preparing to send a police dog into the store to subdue anyone else inside, and she had no alternative but to come out. This does not constitute detrimental reliance.
¶30 Issue Two: Whether Gonzales was unlawfully arrested. Gonzales’ second claim is that the officers wrongfully arrested her when she left the building. The evidence adduced in the proceedings in District Court showed that after Menjivar left the store and was arrested, officers still did not know how many people were left inside or their connection to Menjivar and the robbery. The officers gave commands for anyone inside to come out and after some delay, Gonzales did so. She was directed to lie on the ground and was then handcuffed. After the approximately 30 seconds required to confirm her identity and involvement, she was taken to the hospital.
¶31 This event was at most a justified investigatory stop reasonably related to the officers’ overall response to the robbery at the Town Pump. United States v. Sharpe, 470 U.S. 675, 682, 105 S. Ct. 1568, 1574 (1985); Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968). Even outside the context of responding to a felony in progress, police are allowed to conduct a brief investigatory stop as long as they have a reasonable suspicion that justifies their actions. This is less than probable cause and requires only a minimal level of objective justification. Gallegos v. City of Los Angeles, 308 F.3d 987, 990 (9th Cir. 2002). The Fourth Amendment “accepts the risk”that officers may stop innocent people. Gallegos, 308 F.3d at 992.
¶32 In Montana law, this appears as a requirement for particularized suspicion that criminal activity is currently taking place. State v. *154 Tackitt, 2003 MT 81, ¶ 24, 315 Mont. 59, 67 P.3d 295. The existence of particularized suspicion depends on the totality of the circumstances but does not require certainty on the part of the officer. State v. Trombley, 2005 MT 174, ¶ 9, 327 Mont. 507, 116 P.3d 771.
¶33 In this case the officers did not have to suspect that there was criminal activity taking place. Based upon the information given to them, they were reasonably certain that criminal activity was taking place. The officers responded to a call that there was a robbery in progress at a Town Pump store. They had information that there were two people in the store and that one of them was female, but did not know if there were others. When Menjivar came out and was arrested they did not know how many others were inside or the relationship between any others and Menjivar. Gonzales did not immediately show herself when officers ordered anyone in the building to come out. When Gonzales came out she was directed to lie on the ground, and was handcuffed and detained for what she estimated was only 30 seconds until her status could be determined. Officers were still giving commands directed at clearing the store and were trying to secure the building when Officer Anderson took Gonzales to the hospital for medical care. We decline to adopt a rule that would require officers in a similar situation to assume that anyone else at the scene of a crime is a victim or otherwise not involved in crimin al activity after an initial arrest is made. Under the circumstances presented in this case, the officers responded to Gonzales quickly and professionally and immediately got her to a safe position and to medical care.
¶34 Law enforcement officers are not required to compromise their safety or the safety of others by making potentially unwarranted assumptions as to the identity, involvement or dangerousness of persons at a crime scene. As the District Court noted in this case:
Assumptions get officers and victims killed. It would have been unreasonable for the officers to assume that the plaintiff was the victim without some verification, and they were correct to treat everyone who exited the building as a possible perpetrator.
Officers are justified in diligently pursuing a means of investigation that will confirm or dispel suspicions as expeditiously as the situation allows. In doing so, they may be required to detain and identify a person who is later confirmed to be a victim and not a perpetrator. Officers who do so, however, have not committed any wrong. Sharpe, 470 U.S. at 686-87, 105 S. Ct. at 1575-76. Courts have upheld much longer handcuffed investigatory detentions of persons who were later determined to not be perpetrators. Gallegos, 308 F.3d at 992-93; *155 Haynie v. County of Los Angeles, 339 F.3d 1071, 1077 (9th Cir. 2003).
¶35 Under the circumstances of this case, the brief detention of Gonzales was justified and provides her with no cause of action against the defendants.
¶36 The District Court orders granting summary judgment to the defendants are affirmed.
JUSTICES WARNER, MORRIS and RICE concur.