DA 11-0445

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 68

KEVIN KICHNET,

       Plaintiff and Appellant,

  v.

BUTTE-SILVER BOW COUNTY and
STATE OF MONTANA, acting through the
office of the STATE MEDICAL EXAMINER,
DEPARTMENT OF JUSTICE,

       Defendants and Appellees.

APPEAL FROM:   District Court of the Third Judicial District,
In and For the County of Anaconda-Deer Lodge, Cause No. DV-09-80
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wade J. Dahood, Bernard J. "Ben" Everett, Michelle Sievers, Knight,
Dahood, Everett & Sievers, Anaconda, Montana

      For Appellee Butte-Silver Bow County:

          Brendon J. Rohan, Poore, Roth & Robinson, P.C., Butte, Montana

      For Appellee State of Montana:

          Randy J. Cox, Thomas J. Leonard, Boone Karlberg, P.C.,
Missoula, Montana

      For Amicus Curiae Montana Trial Lawyers Association:

          Lawrence A. Anderson, Attorney at Law, Great Falls, Montana

          Karl J. Englund, Attorney at Law, Missoula, Montana

Submitted on Briefs:  January 25, 2012

Decided:  March 22, 2012

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    For several months nineteen-year-old Kevin Kichnet had been babysitting his young nieces, Eternity and Jerica, on Wednesdays and Thursdays and was doing so on November 16, 2006.  On November 16, Kichnet met three-year-old Eternity across the street from the children's house when the Head Start bus dropped her off after school.  Kichnet claimed he was holding her hand as they crossed the street when Eternity collapsed.  He carried her inside and called 9-1-1 but shortly after Eternity reached the hospital she was pronounced dead.  The authorities determined Eternity died from blunt force trauma to her body.  On November 17, Kichnet was arrested for deliberate homicide and jailed.  Kichnet remained in jail for approximately two months until he was able to post bail.  On July 15, 2007, charges against Kichnet were dropped when it was determined that the Head Start school bus had run over Eternity.  Kichnet sued Butte-Silver Bow County (BSB or the County) claiming BSB law enforcement officers performed their investigation negligently resulting in Kichnet's arrest and incarceration.  He also sued the State of Montana claiming the State Medical Examiner performed his duties negligently when he reported Eternity's death as a homicide, leading to Kichnet's arrest.  BSB and the State both moved for summary judgment and the Third Judicial District Court granted the motions.  We affirm.

## ISSUE

¶2    The dispositive issue on appeal is whether the District Court erred in granting summary judgment to BSB and the State.

3

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3     Kichnet was babysitting for his young nieces on November 16, 2006.   At 1:55 p.m., while the younger child slept, Kichnet met three-year-old Eternity at the Head Start bus stop across the street from their house.   Minutes later Kichnet was on the phone with 9-1-1 reporting that Eternity was unconscious.   Numerous BSB officers responded to the call, some of whom worked with emergency medical personnel to transport Eternity to the hospital and some of whom spoke with Kichnet about what happened.

¶4     Kichnet told officers at the scene that he had met Eternity at the bus stop, taken her hand once she was off the bus, and walked her in front of the bus while still holding hands.   He said he noticed the Head Start bus turn north onto Jackson Street, then felt Eternity's grasp loosen as she "collapsed" to the ground.   He reported that her eyelids were partially closed and her eyes were rolled to the back of her head.   He claimed he heard strange noises from her throat.   He spoke to her but she was unresponsive.   Kichnet stated he picked her up and quickly carried her inside, placing her on the couch, and removing her coat, shoes and the "bus pass" hanging around her neck.   He explained that he called two family members but was unable to reach them.   His third call was to his aunt who instructed him to call 9-1-1 immediately which he did.   While awaiting the ambulance and after detecting Eternity's heartbeat but no breath, he began performing chest compressions on her.

¶5     Kichnet's aunt and her boyfriend arrived almost immediately and the boyfriend began CPR.   An ambulance arrived shortly thereafter and took Eternity to the hospital. Eternity was pronounced dead with thirty minutes of arriving at St. James Hospital.   She

was then transported to Missoula for an autopsy. During this time, two officers transported Kichnet to the police station for further questioning. Kichnet repeated his story during the station interview, but when questioned about how Eternity's severe injuries could be reconciled with Kichnet's version of her collapse to the ground, Kichnet invoked his right to counsel. The interview was stopped and he was placed on a 48-hour investigative hold and was appointed counsel. That same day, officers returned to the house and recovered potential evidence, including a pink coat Eternity had been wearing when she got off the bus. Officers noticed a tread pattern mark on the coat that they believed could match Kichnet's shoes. The following day, after repeated interviews in which Kichnet could not explain what happened to Eternity, Kichnet was arrested for deliberate homicide.

¶6    On the evening of November 16, Dr. Walter Kemp, the Deputy State Medical Examiner in Missoula, performed an autopsy on Eternity. At that time, Kemp was told of Kichnet's description of the events; thus, Kemp believed that Kichnet had been holding Eternity's hand and Eternity had collapsed to the ground after the bus had departed. As a result of Kichnet's statements, Kemp ruled out the bus as a cause of Eternity's injuries. In his initial report issued on December 15, 2006, Kemp concluded Eternity had died from blunt force injuries to the trunk of her body and that her death was a homicide.

¶7    On November 16 and 17, officers spoke with the bus driver and the bus assistant who helped Eternity out of the bus. Both stated that Eternity and Kichnet were near the sidewalk or the gate when the bus pulled away. The bus had been washed overnight so had there been any evidence of an accident, it had been washed away.

¶8     On December 1, the Deputy County Attorney for BSB filed an Application for Leave to File an Information by Affidavit (Affidavit).  This Affidavit set forth the detailed events of November 16 as related by Kichnet and the responding officers.  The Affidavit also contained Kemp's conclusion that Eternity's death was a homicide.  The District Court determined that based on the facts set forth in the seven-page Affidavit, probable cause existed for the filing of an Information charging Kichnet with deliberate homicide.

¶9     On April 4, 2007, the State forensic scientist reported that the tread mark on Eternity's coat did not match Kichnet's shoes.  On April 30, 2007, the forensic scientist indicated that the tread track on Eternity's coat matched the rear tires of the Head Start bus.  On May 18, 2007, Kemp issued an amended report concluding the same cause of death but that the manner of death was "undetermined."  Also in May 2007, Kichnet admitted for the first time that he had lied about holding Eternity's hand and possibly about the location of the bus as he and Eternity were crossing the street.  On July 15, 2007, charges against Kichnet were dropped.

¶10    On August 27, 2009, Kichnet filed suit against BSB and the State alleging negligent investigation of the cause of death and negligent arrest.  Both parties answered the complaint and asserted numerous affirmative defenses, including but not limited to statutory immunity and protection under the public duty doctrine (PDD).[1]  They also

---

[1] The public duty doctrine is "[t]he rule that a governmental entity (such as a state or municipality) cannot be held liable for an individual plaintiff's injury resulting from a governmental officer's or employee's breach of a duty owed to the general public rather than to the individual plaintiff."  *Black's Law Dictionary* 1243 (Bryan A. Garner ed., 7th ed., West

argued that any delay in analyzing the tires of the bus was caused by Kichnet's affirmative misrepresentation of the facts. In August 2010, the State filed a motion for summary judgment, and in March 2011, BSB did so as well. On June 7, 2011, the District Court granted both parties' motions. Kichnet appeals.

## STANDARD OF REVIEW

¶11 We review the grant of summary judgment de novo, using the same M. R. Civ. P. 56 criteria used by the district court. Summary judgment is appropriate when the moving party demonstrates both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law. *Styren Farms, Inc. v. Roos*, 2011 MT 299, ¶ 10, 363 Mont. 41, 265 P.3d 1230.

## DISCUSSION

¶12 *Did the District Court err in granting summary judgment to BSB and the State?*

*Summary Judgment for the State*

¶13 Kichnet argued to the District Court that State Medical Examiner Kemp exceeded his statutory authority when he opined that the manner of death was homicide. Kichnet asserted that Kemp should have limited the information contained in his report to the cause of death, i.e., blunt force trauma, with no reference to the manner of death. Kichnet claimed that when Kemp declared the manner of death, "he had a duty to avoid negligence in doing so." He asserted that Kemp's declaration of homicide constituted negligence and this negligence led to Kichnet's unlawful arrest and false imprisonment.

_____

1999). The PDD "serves the important purpose of preventing excessive court intervention into the governmental process by protecting the exercise of law enforcement discretion." *Nelson v. Driscoll*, 1999 MT 193, ¶ 21, 295 Mont. 363, 983 P.2d 972 (citation omitted).

The State argued that it was statutorily immune from such prosecution or, in the alternative, the public duty doctrine protected it from liability arising from Kichnet's negligence claim.

¶14 Kichnet countered that §§ 44-3-401 and 46-4-104, MCA (2009), relied upon by the State, did not immunize the State from liability because the statutes were applicable to negligently performed autopsies, and not claims of negligence in post-autopsy reporting. He also claimed that the "special relationship" exception to the PDD applied. Additionally, Kichnet argued that the PDD was unconstitutional and that it should be abolished.

¶15 Without analysis, the District Court declared §§ 44-3-401 and 46-4-104, MCA (2009), inapplicable stating that the statutes apply exclusively to "performing an autopsy," and not to claimed negligent behavior following an autopsy. The court then analyzed the case under the PDD and concluded that the PDD immunized the State of Montana from Kichnet's negligence claims. It determined that no special relationship existed, and therefore no exception to the PDD applied. The court also noted that this Court upheld the application of the PDD in *Gonzales v. City of Bozeman*, 2009 MT 277, 352 Mont. 145, 217 P.3d 487.

¶16 On appeal, Kichnet reasserts his claim that Kemp negligently reported the manner of death as a homicide. Kichnet acknowledges that the conclusion of homicide stemmed in part from Kemp's having ruled out the bus as a factor based on Kichnet's story to police, but complains that Kemp should have waited "for the analysis of the tread marks found on Eternity's coat prior to making his determination that the manner of death was a

8

homicide." Kichnet opines that Kemp's conclusion was a violation of the professional standards of care for a forensic pathologist. He again argues that the PDD does not protect the State from his claim.

¶17 We first address the State's argument that it is statutorily immune under §§ 44-3-401 and 46-4-104, MCA (2009). Section 44-3-401, MCA (2009), provides that "No criminal or civil action may arise against a medical examiner for performing an autopsy under this chapter or for performing an autopsy on request of a federal officer investigating a death within a federal jurisdiction." Section 46-4-104, MCA (2009), provides that "A mortuary owner or person employed in a mortuary is not liable for the acts of the coroner performed in the removal of a body to a mortuary or during the course of an autopsy on that body. No criminal or civil action may arise against a licensed physician for performing an autopsy authorized by this chapter or for performing an autopsy on request of a federal officer investigating a death within a federal jurisdiction."

¶18 The District Court concluded these statutes did not provide immunity to Kemp as they applied only to the performance of the autopsy and not to conclusions reached in the coroner's report. We disagree. There would be no reason for a medical examiner to perform an autopsy at the request of police but not report the autopsy findings and his conclusions. The issuance of the report is an integral component of the autopsy process, and is thus covered by statutory immunity. Kichnet offers no authority to the contrary. In fact, it appears that providing a conclusion concerning the manner of death is an ordinary component of a "Report of Postmortem Examination." *See e.g. State v. Hansen*, 1999 MT 253, ¶ 7, 296 Mont. 282, 989 P.2d 338 (State Medical Examiner certified death

9

as a homicide.); *State v. Bieber*, 2007 MT 262, ¶ 11, 339 Mont. 309, 170 P.3d 444 (State Medical Examiner reported a preliminary conclusion of a natural death.); *State v. Stout*, 2010 MT 137, ¶ 28, 356 Mont. 468, 237 P.3d 37 (The Autopsy Report concluded the death was a homicide.); *State v. Dist. Court of the Eighteenth Judicial Dist.*, 2010 MT 263, ¶ 13, 358 Mont. 325, 246 P.3d 415 (State Medical Examiner reported the manner of death was "undetermined" but explained that "no definitive natural cause of death was identified."). These cases illustrate that including a reported "manner of death" is a standard component of an autopsy report. We therefore hold that the State is immune under the cited statutes from Kichnet's negligence claim and the District Court correctly granted the State's motion for summary judgment.

¶19 Having reached this conclusion, we need not address Kichnet's claim under the PDD. We affirm the District Court's order of summary judgment in favor of the State, as the court reached the correct result albeit for the wrong reason. *Hinebauch v. McRae*, 2011 MT 270, ¶ 25, 362 Mont. 358, 264 P.3d 1098.

*Summary Judgment for BSB County*

¶20 We next address the District Court's order granting BSB's motion for summary judgment. Kichnet argued that the County negligently performed its investigation into Eternity's death by focusing solely on Kichnet as a suspect and not investigating other possible causes for her death. He also maintains BSB should be held accountable for his false imprisonment. The County argued to the District Court that there is no cognizable claim for "negligent investigation." BSB also maintained that the PDD barred Kichnet's negligence claim, and his false imprisonment claim failed because the County had

10

probable cause to arrest and incarcerate Kichnet. The District Court ruled in favor of BSB on both the PDD and probable cause arguments.

¶21 We conclude the District Court did not err in determining that there was probable cause for the arrest and incarceration of Kichnet, and that the investigation by the County was not negligent. BSB officers questioned Kichnet repeatedly about the events that led to Eternity's death. He consistently stated that he did not know why the child collapsed or what caused her death. He told them multiple times that the bus had pulled away and while he was holding Eternity's hand, she simply collapsed to the street. Officers also questioned the bus driver and bus assistant, both of whom asserted that Eternity was at least ten feet from the bus when the bus pulled away. Based upon these seemingly consistent summaries of events, there was no reason for BSB to investigate the possibility that the bus had struck and injured Eternity.

¶22 Because the suspect himself had unequivocally eliminated the bus as a source of Eternity's injuries, the authorities had to look elsewhere for a possible cause of Eternity's violent death while in Kichnet's care. The officers conducting this investigation knew from experience that when a child is traumatically injured and the adult with her at the time can provide no reasonable explanation for the injuries, that adult is usually implicated. Given that Kichnet was the only person with Eternity at the time she was stricken and the violence of Eternity's injuries, the only reasonable explanation for Eternity's sudden death was that she had come to harm while in the care of Kichnet. Under these circumstances, it was not negligent for the County to turn its investigation toward Kichnet.

11

¶23 Turning to Kichnet's false imprisonment claim against the defendants, there are two components of a claim for false imprisonment: the restraint of an individual against his will, and the unlawfulness of the restraint. *Hughes v. Pullman*, 2001 MT 216, ¶ 21, 306 Mont. 420, 36 P.3d 339. In the case before us, the first element is clearly met but the second is not. Kichnet's restraint was lawful. He was incarcerated pursuant to a court order issued on the basis of comprehensive factual allegations contained in the Affidavit supporting BSB's Application for Leave to File Information, which established probable cause. It is well-settled that a court's determination of probable cause is a complete defense to a claim of false arrest or imprisonment leveled against the charging party. *Groves v. Croft*, 2011 U.S. Dist. LEXIS 130645 ** 66-67 (D. Mont., Nov. 10, 2011). Groves sued Red Lodge officers Croft and Neibauer, claiming the officers used excessive force in unlawfully arresting and imprisoning him following a bar fight. As the *Groves* court noted, "the existence of probable cause is a complete defense to claims of false arrest and false imprisonment. Under Montana law, an arrest warrant may issue if 'there is probable cause to believe that the person against whom the complaint was made has committed an offense[.]' MCA § 46-6-201. . . . Because the existence of probable cause, upon which the valid arrest warrant was based, is a defense to false arrest and imprisonment . . . [Groves'] claim fails." *Groves, citing Dean v. Sanders Co.*, 2009 MT 88, ¶ 37, 350 Mont. 8, 204 P.3d 722 (internal citations omitted). Because Kichnet was lawfully restrained pursuant to a court determination of probable cause, his false imprisonment claims must likewise fail.

12

¶24     For these reasons, we affirm the District Court's order of summary judgment in favor of BSB.

## CONCLUSION

¶25     We affirm.

/S/ PATRICIA COTTER

We concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ JIM RICE
/S/ BETH BAKER