FILED

May 19 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0309

DA 14-0309

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 139

SARA KENT, individually and as
Personal Representative of the
Estate of CASEY KENT, deceased,
and as guardian for their minor children,
STELLA KENT and LILA KENT,

        Plaintiff and Appellant,

vs.

CITY OF COLUMBIA FALLS,

        Defendant and Appellee.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV 11-655B
Honorable Robert B. Allison, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            John F. Lacey, McGarvey, Heberling, Sullivan & Lacey, PC, Kalispell, Montana

        For Appellee:

            Todd A. Hammer, Angela K. Jacobs, Hammer, Jacobs & Quinn, PLLC, Kalispell, Montana

        For Amicus Curiae:

            Justin Stalpes, Beck & Amsden, PLLC, Bozeman, Montana
            (*Attorney for Montana Trial Lawyers Association*)

            Jim Nugent, Missoula City Attorney, Susan A. Firth, City of Missoula Chief Civil/Administrative Attorney, Missoula, Montana;
            (*Attorneys for Montana League of Cities and Towns*)

                        Submitted on Briefs:  December 24, 2014
                                    Decided:  May 19, 2015

Filed:

_____
Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1      Casey Kent, aged 35, died on June 14, 2008, as the result of a head injury he suffered on June 2, 2008, after falling while skateboarding in Cedar Pointe Estates in Columbia Falls, Montana.  Sara Kent, Casey's wife, sued the City of Columbia Falls and various other entities involved in designing, developing, and constructing Cedar Pointe Estates.  She alleged multiple counts including negligence, premises liability, breach of professional duties, and wrongful death.  Sara claims that a portion of the paved path upon which Casey was skating was built with a 24% grade and the steepness of this grade caused Casey's fall and resultant fatal head injury.  Sara ultimately settled with all defendants except the City of Columbia Falls.  The Eleventh Judicial District Court for Flathead County granted the City's motions for summary judgment.  Sara appeals.  We reverse and remand.

## ISSUE

¶2      A restatement of the issue is whether the District Court properly applied the public duty doctrine to grant summary judgment to the City.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      Development of a 20-acre plot of land in southeast Columbia Falls began in approximately 2003.  Donald Gatzke owned the property and hired John Schwarz with Schwarz Architecture & Engineering (later APEC Engineering) to design the infrastructure, draft and submit official and detailed plans to the City, and construct what became a 79-lot residential PUD development known as Cedar Pointe Estates.  A PUD, a/k/a "planned unit development," is a planned community that allows for varied and compatible land uses. This type of development gives local governments and developers greater flexibility in designing

3

a proposed subdivision than would be allowed with a traditional subdivision. It authorizes a city to approve a project that might not otherwise conform to applicable zoning and subdivision regulations.

¶4 In the design documents submitted to the City for approval, Gatzke and Schwarz proposed features for Cedar Pointe that did not meet City standards. For example, they proposed installing narrow streets without sidewalks. Narrow streets that do not allow emergency vehicles to navigate a neighborhood if cars are parked on the streets do not meet the City's standards for a residential development but can satisfy the requirements for a PUD if other accommodations are made. As an accommodation for narrow streets and the lack of sidewalks, Gatzke and Schwarz proposed construction of multiple small parking lots and a trail system that included both a bike and a walking path.

¶5 In October 2003, the City Council of Columbia Falls adopted Resolution No. 1316 in which it conditionally approved the preliminary plat submitted for Cedar Pointe.[1] Attached to the resolution were 28 conditions imposed by the City. Condition 12 stated: "In lieu of sidewalks throughout the development the applicant shall install a bicycle and pedestrian trail system as shown on Drawing C-3 prepared by Schwarz Engineering and dated 09-18-03 . . ." with modifications. The City instructed that the trail system be widened and extended in specified locations. It also required the city manager to "approve of the design and location of the trails prior to the start of construction."

---

[1] Early documents refer to the subdivision as Cedar Park Subdivision. The name was changed after November 2004.

4

¶6     In November 2003, the City Council approved Ordinance No. 647, an amendment to the development of the Cedar Pointe PUD. Attached to the ordinance was another set of conditions. Condition 9 provided that a non-motorized trail system (bike path) was to be constructed as part of the subdivision. It described where the bike path was to be located, the width of the bike path, and that the City would maintain all portions of the bike trail as it was located within the City's right-of-way. Condition 10 instructed that a walking path would be built within the subdivision and would provide direct access to every lot that did not share a property line with either the bike path or a public street. The location and width of the walking path was specified. Again, the City retained the right to "approve of the design and location of the trails prior to the start of construction."

¶7     In July 2007, the City Council approved Ordinance No. 690 which included additional amendments to Cedar Pointe. Attachments to Ordinance No. 690 required that the bike path be re-routed in places and that both the bike and the walking paths be paved. The Subdivision Improvement Agreement (SIA) attached to Ordinance No. 690 stated: "The City, in its sole and exclusive discretion, shall determine when and if all of the required conditions of the PUD, Plat or related documents have been met." Attached to the SIA was a Final Plat Report requiring the developer to post a security bond of $471,867.75 to cover completion of the proposed work. Also attached was an APEC Inspector's Daily Record of Work Progress dated March 8, 2007, indicating remaining items to be completed. One such item was "Bike path and walking paths will need to be completed with specified grades and surfacing materials."

5

¶8 On July 31, 2007, a contractor on the Cedar Pointe construction project contacted APEC questioning the grade of the bike path and whether it met ADA (Americans with Disabilities Act) standards. APEC responded in writing that the bike path must be ADA-compliant but that the walking path need not be. The letter indicated that APEC had conferred with the city manager who stated the City had no expectation of ADA-compliance for the walking path. The Manager further advised that Gatzke should seek legal advice concerning whether an ADA-non-compliant sidewalk was acceptable from a liability standpoint. APEC opined that "it would be exceedingly challenging to meet ADA grade guidelines for the complete walk path system on the Cedar Pointe property."

¶9 Throughout construction of the trail system, City officials made numerous on-site visits and inspections. Additionally, at multiple times during construction the City notified engineers and contractors on the project that failure to comply with the City's instructions could result in the City's denial of approval or rejection of the project. On December 21, 2007, the City Director of Public Works indicated that the final inspection of all infrastructure items had been completed and approved, with the exception of a short list of remaining items not pertinent to the trail system, and that the original security bond should be released.

¶10 On June 2, 2008, Casey Kent was skateboarding within the subdivision along the paved walking path. At the bottom of a 24% decline in the path, Casey fell off his board, hit his head, and lost consciousness. He was transported by ambulance and subsequently airlifted to a hospital where he died 12 days later of severe head trauma.

¶11 On June 1, 2011, Sara filed suit against the City of Columbia Falls, Gatzke, Schwarz, APEC, the Cedar Pointe Estates Homeowners' Association, and various John Does. Among her complaints against all defendants, including the City, were allegations of negligence, willful or wanton misconduct, negligence per se, and wrongful death. She alleged claims of premises liability, nuisance, and attractive nuisance against the City, Gatzke, and the Homeowner's Association. Lastly, she asserted a claim exclusively against the City for failure to follow its own regulations. During the first three years of litigation, Sara settled with all the defendants except the City of Columbia Falls.

¶12 In February 2012, early in the proceedings, the City moved for summary judgment on all counts against it. The City disputed premises liability, claiming that it did not own the property, did not construct the path, and expressly required the homeowner's association to maintain the walking path. The City also argued that it did not assume any duty by virtue of its supervisory authority over and involvement in designing the walking path's layout because the public duty doctrine precludes the existence of such a duty. Consequently, the City asserted, without a duty to be breached, Sara's negligence and premises liability claims could not stand. Both Sara and APEC opposed the City's motion. APEC filed a brief in opposition arguing that the "special relationship/detrimental reliance" exception to the public duty doctrine applied in this case; therefore, the City may be held liable.

¶13 Sara chose not to address the public duty doctrine in her brief in opposition, asserting that discussion of the doctrine, if necessary, should be reserved for a future date after all potential parties had been identified. Rather, she argued that applying the public duty doctrine was unnecessary because the City created a non-delegable legal duty for itself when

7

it adopted resolutions and ordinances allowing the development and construction of the trail system for Cedar Pointe Estates to replace sidewalks throughout the subdivision, subject to explicit conditions. She claimed that by allowing Cedar Pointe Estates to utilize a trail system in lieu of sidewalks, the City retained the same responsibilities and liabilities for the trail system as it had for other City sidewalks. Sara observed that the general public using the trail system saw no distinction between the bike path and the walking path, nor did the City seek to establish such a distinction.

¶14 Sara also asserted that in addition to the statutory duty, the City voluntarily undertook oversight of the trail system based upon its self-imposed obligation to "approve" the trail system and its active participation in the design and location of the trail system. Relying on *Dobrocke v. City of Columbia Falls*, 2000 MT 179, ¶ 33, 300 Mont. 348, 8 P.3d 71, *overruled in part on other grounds by Roberts v. Nickey*, 2002 MT 37, 308 Mont. 335, 43 P.3d 263. Sara claimed the City's duties required it "to act with reasonable care in the approval of the design and location of the trails . . . ." She opined that the existence of these duties rendered application of the public duty doctrine unnecessary and incorrect.

¶15 The District Court conducted a hearing and on November 10, 2012, granted the City's motion on multiple counts of the complaint, including premises liability. Upon entry of this order, Sara's only claims against the City that remained extant were those alleging willful or wanton misconduct and wrongful death.

¶16 On December 21, 2012, this Court issued its decision in *Gatlin-Johnson v. City of Miles City*, 2012 MT 302, 367 Mont. 414, 291 P.3d 1129, in which we addressed the public

8

duty doctrine as it pertains to public safety in a municipal park. A detailed discussion of *Gatlin-Johnson* is provided below.

¶17 In April 2013, Columbia Falls moved for summary judgment on the remaining counts. Sara both opposed the City's motion and, in light of our decision in *Gatlin-Johnson*, filed a motion under M. R. Civ. P. 54(b) seeking reconsideration of the District Court's earlier summary judgment rulings pertaining to her negligence claims and her claim that the City failed to follow its own regulations. On March 21, 2014, the District Court granted the City's motion for summary judgment. It also determined that *Gatlin-Johnson* was not dispositive and denied Sara's motion for reconsideration.

¶18 Sara filed a timely appeal.

## STANDARD OF REVIEW

¶19 This Court reviews a district court's decision on a motion for summary judgment de novo, to determine whether it is correct, applying the same considerations as the district court under M. R. Civ. P. 56. Summary judgment is proper when the moving party shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Gatlin-Johnson*, ¶ 10 (citations omitted).

¶20 The existence of duty is an issue of law, and this Court reviews a decision on an issue of law to determine whether it is correct. *Gatlin-Johnson*, ¶ 11 (citations omitted).

**DISCUSSION**

¶21 *Did the District Court properly apply the public duty doctrine to grant summary judgment to the City?*

¶22 As indicated by this issue statement, Sara's appeal is narrow. Notably, we are not determining whether the City is liable to Sara nor are we determining whether the District Court's discussion of the public duty doctrine and its exceptions is correct. Our focus here is whether the District Court should have applied the doctrine at all under the facts of this case and our ruling in *Gatlin-Johnson*.

*Public Duty Doctrine*

¶23 "The public duty doctrine provides that a governmental entity cannot be held liable for an individual plaintiff's injury resulting from a governmental officer's breach of a duty owed to the general public rather than to the individual plaintiff." *Gatlin-Johnson*, ¶ 14. Under the doctrine, "where a municipality owes a duty to the general public, that duty is not owed to any particular individual." *Prosser v. Kennedy Enters. Inc.*, 2008 MT 87, ¶ 18, 342 Mont. 209, 179 P.3d 1178. Such duties to the general public include law enforcement services and fire protection. "[A] law enforcement officer has no duty to protect a particular person absent a special relationship because the officer's duty to protect and preserve the peace is owed to the public at large and not to individual members of the public." *Gonzales v. City of Bozeman*, 2009 MT 277, ¶ 20, 352 Mont. 145, 217 P.3d 487. *See also Coty v. Washoe Cty.*, 839 P.2d 97 (Nev. 1992)("[T]he duty to fight fires 'runs to all citizens and is to protect the safety and well-being of the public at large.' Therefore, the duty of fire and police departments 'is one owed to the public, but not to individuals.'"). An exception to the

public duty doctrine exists when a "special relationship" arises, "giving rise to [a] special duty that is more particular than the duty owed to the public at large." *Nelson v. Driscoll*, 1999 MT 193, ¶ 22, 295 Mont. 363, 983 P.2d 972.

¶24 A special relationship generally can be established in one of the following four circumstances: (1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff. *Nelson*, ¶ 22. To establish a "special relationship" under the third exception, a plaintiff must show that: (1) there has been direct contact between the public official and the plaintiff; (2) the official has provided express assurances in response to the plaintiff's specific inquiry; and (3) the plaintiff justifiably relied on the representations of the official. *Prosser*, ¶ 36.

*District Court Arguments*

¶25 Sara argued to the District Court that the City had assumed two distinct and specific duties, both of which were firmly grounded in "generally applicable principles of law," and neither of which were owed to the public at large: (1) the City took upon itself through its ordinances a non-delegable statutory duty to approve the design and construction of the Cedar Pointe Estates' trail system, which includes both the bike path and the walking path; and (2) the City voluntarily undertook—through its active role in deciding and monitoring the location and layout of the trail system—the duty to "act" with reasonable care in

11

approving the walking path because its participation in the planning and building process went beyond simple approval. Sara asserted that a duty of reasonable care attached to both the statutory and voluntary obligations, and that breach of these duties was sufficient to support her tort claim against the City.

¶26 Before eventually settling with Sara, APEC had argued in opposition to the City's motion for summary judgment that the City's substantial participation in the design and completion of all facets of the Cedar Pointe Estates, including the walking path, created a special relationship with Casey that "reasonably induced" Casey's reliance, to his detriment, that the walking path was designed and constructed in the same safe manner as the bike path and other sidewalks throughout the City. Thus, it was APEC—and not Sara—that raised the public duty doctrine in opposition to the City's motion for summary judgment.

*District Court's Rulings*

¶27 The focus of Sara's appeal is the District Court's initial application of the public duty doctrine in its November 2012 order (Order I), and its subsequent March 2014 order following publication of *Gatlin-Johnson*, in which it refused to reconsider application of the doctrine (Order II).

¶28 In Order I, the court made the following relevant findings:

(1) The City approved construction of a private subdivision containing an interconnected trail system consisting of a bike path and a walking path.

(2) In approving the subdivision, the City mandated that "[t]he City shall approve of the design and location of the trails [in the trail system] prior to the start of construction.

(3) Correspondence between City employees and the developer suggests "that the City's involvement went beyond mere approval; rather, the City appears to have taken an active role in deciding the location and layout of the trail system."

The City did not challenge these findings through cross-appeal.

¶29 The District Court noted that several of Sara's claims sounded in both negligence and premises liability. For example, three of her claims alleged that the City (1) negligently designed, built, and operated the walking path; (2) breached its duty to keep the walking path safe for travel; and (3) failed to warn of a defective or dangerous condition on the walking path. The court concluded that disposition of the case first required a determination of whether the City owed a legal duty to Sara.

¶30 The court determined that the City had no duty under premises liability because the City did not own or maintain the property upon which Casey was injured.[2] Moreover, the court concluded that the cases imposing "adjacent landowner" premises liability did not apply to the City in this case. Sara does not appeal the court's ruling pertaining to premises liability.

¶31 Turning to Sara's claims and the City's public duty doctrine argument, the court observed that Sara had presented no argument on the merits of the City's public duty doctrine claim. The court, therefore, limited its analysis of the public duty doctrine to APEC's argument that the "special relationship/detrimental reliance" exception to the doctrine existed in this case. Relying on *Prosser*, the District Court concluded that the exception to the public duty doctrine did not apply because an element of this exception required direct contact between Casey and a City official and there was no such contact. The

---

[2] Premises liability may be imposed on a property owner who breaches the duty to use ordinary care in maintaining the premises in a reasonable safe condition and to warn others of hidden or lurking dangers. *Richardson v. Corvallis Pub. Sch. Dist. No. 1*, 286 Mont. 309, 321, 950 P.2d 748, 755 (1997).

court did not address Sara's claims that the City breached both a statutory and a voluntary duty, independent of the public duty doctrine.

¶32 In Order II, the District Court specifically acknowledged Sara's claim that the City-adopted ordinances created a statutory duty for the City but the court characterized the argument as an argument that the "statutory" exception of the public duty doctrine applied. Therefore, the court again applied the doctrine and determined that the ordinance was not the type of statute that created a "specific class of [protected] persons." The District Court stated that the City of Hamilton ordinances in *Prosser* and the City ordinances in the instant case were both passed to promote general health and welfare and therefore did not create a duty to an individual. Consequently, the court concluded that Sara's claim of negligence failed.

¶33 Addressing Sara's claim of a voluntarily-acquired duty and her application of *Gatlin-Johnson*, the court determined that *Gatlin-Johnson* was a distinguishable premises liability case and not applicable to Sara's claims. The court noted that it had addressed premises liability in Order I and would not revisit it. Choosing to analyze *Gatlin-Johnson* no further, the court concluded its analysis with the assertion that "the decision in *Gatlin* held that the public duty doctrine *does apply to land use decisions by local government*." (Emphasis in original.)

¶34 The District Court misstates the holding in *Gatlin-Johnson*. In *Gatlin-Johnson*, we held that summary judgment granted to the City was error because the court did not allow the plaintiff to present her case at trial. However, in preface to our analysis in that case, we acknowledged numerous public duty doctrine cases that have been decided in our Court over the past decade. We included *Prosser* in this list, acknowledging that we applied the public

14

duty doctrine in *Prosser* "to land use decisions by a local government body." However, by deciding *Prosser* as we did, we did not intend to hold that all future "land use decisions by a local government" would be analyzed exclusively under the public duty doctrine, regardless of the level of participation by the municipality in the design and development of the given project.

*Sara's Claims On Appeal*

¶35    Sara argues on appeal that the District Court erred in refusing to reconsider application of the public duty doctrine in light of our clarification in *Gatlin-Johnson* that "The public duty doctrine was not intended to apply in every case to the exclusion of any other duty a public entity may have. . . . It does not apply where the government's duty is defined by other generally applicable principles of law." *Gatlin-Johnson*, ¶ 17. Sara maintains that there was no need for the court to invoke the public duty doctrine because the City had both a statutory duty and a duty based upon a voluntary undertaking to protect the public using the trail system in Cedar Pointe, and that breach of these duties was sufficient to support her tort claims. *Gatlin-Johnson*, ¶ 19. She argues that the District Court erred when it presumptively applied the doctrine and its special exceptions without first assessing whether the City's statutes and voluntary control were sufficient to support her tort claims.

¶36 The City responds that the District Court's Order I correctly analyzed whether the City owed a specific duty to Casey and concluded it did not. The City argues that Sara's claims of a statutory and voluntary duty are actually assertions that the first and second exceptions of the public duty doctrine apply and therefore the District Court correctly analyzed the case under the public duty doctrine.

*Gatlin-Johnson*

¶37 In *Gatlin-Johnson*, an eight-year-old girl was severely injured when she fell from a slide in a Miles City-owned playground and hit her head on the ground. The child's mother sued Miles City alleging that the City was negligent for failing to maintain sufficient "impact-absorbing material" around and beneath the slide. Gatlin-Johnson claimed that both the slide manufacturer and the Consumer Product Safety Commission required that there be 12 inches of impact-absorbing material under the slide. *Gatlin-Johnson*, ¶ 6. The District Court concluded that the City had a duty to safely maintain the playground area in the park, but that this duty was "owed to the general public at large" and was not a duty owed specifically to Gatlin-Johnson's daughter. The court, applying the public duty doctrine, observed: "[w]here a tort claim is made against a public body, such as a municipality, the public duty doctrine bars recovery unless a duty is created by a 'special relationship.'" The district court concluded no special relationship exceptions applied. *Gatlin-Johnson*, ¶ 7. The district court granted summary judgment to Miles City holding that the City owed no duty to Gatlin-Johnson's daughter and that absent such a duty the City was not liable.

¶38     On appeal, this Court acknowledged numerous cases in which we recognized the applicability of the public duty doctrine, and discussed the "special relationship" exception that can render the doctrine inapplicable. *Gatlin-Johnson*, ¶¶ 15-16.  We then addressed the district court's reliance on language contained in previous cases that "it is necessary" for district courts "to consider the public duty doctrine whenever there is a negligence claim against a public entity or person." *Gatlin-Johnson*, ¶ 17.  Without expressly stating that the subject language was being misinterpreted, we explained:

> Consideration of the public duty doctrine does not mean . . . that it always applies whenever a public entity or person is a defendant in a negligence case. The public duty doctrine was not intended to apply in every case to the exclusion of any other duty a public entity may have.  It applies only if the public entity truly has a duty owed only to the public at large, such as a duty to provide law enforcement services or regulate the practice of medicine.  It does not apply where the government's duty is defined by other generally applicable principles of law.

*Gatlin-Johnson*, ¶ 17.  We then discussed multiple cases in which we have applied the duty of care in premises liability cases to governmental defendants without relying upon the public duty doctrine. *Gatlin-Johnson*, ¶ 18.  We observed that it was "clear that in each [summarized] case there was no need to invoke the public duty doctrine because the governmental entity had a specific duty, such as premises liability, that was sufficient to support a tort claim."  We observed that this method of addressing government liability was consistent with the Montana Tort Claims Act, which holds every governmental entity in Montana subject to liability for its torts.  We referenced the definition of "claim" in the context of governmental tort liability "as arising from an act or omission 'under circumstances where the governmental entity, if a private person, would be liable to the

17

claimant for the damages under the laws of the state.'" *Gatlin-Johnson*, ¶ 19; § 2-9-101(1), MCA.

¶39 We concluded in *Gatlin-Johnson* that the district court erred in applying the public duty doctrine simply because a municipality was the defendant and the park was open to the public. *Gatlin-Johnson*, ¶ 20. Consequently, we reversed and remanded the case to the district court for further proceedings. *Gatlin-Johnson* is not "new" law; rather, it is a reminder that courts should first determine whether a governmental defendant has a specific duty to a plaintiff arising from "generally applicable principles of law" that would support a tort claim. If a private person would be liable to the plaintiff for the acts that were committed by the government, then the governmental entity would similarly be liable. Where such a specific duty and breach exists, the public duty doctrine has no application.

*Prosser*

¶40 As noted above, the District Court relied on *Prosser* in its analysis in both Orders I and II. In *Prosser*, defendant Kennedy purchased a former fast food restaurant and submitted plan documents to the City of Hamilton proposing modification of the property for commercial use as a casino and lounge. Following a hearing, at which two of the plaintiffs attended and raised concerns, the Hamilton City Zoning Board of Adjustment adopted the plan by resolution and subsequently issued a permanent certificate of occupancy. *Prosser*, ¶¶ 5-6. The casino promptly became a nuisance with noise, fights, drug use, and garbage. Three neighbors living in a residential area adjacent to the casino sued Kennedy and the City alleging that the City owed them a special duty, *i.e.*, had a "special relationship" with them, because ordinances approved for construction and operation of the casino and the ordinances

18

being violated (noise, drugs, etc.,) had been adopted to protect them specifically as neighbors. They alleged the Board of Adjustment violated various ordinances in approving Kennedy's plan, and that various City officials had failed to abate the nuisance despite plaintiffs' requests. *Prosser*, ¶¶ 7-8. The district court, analyzing the case under the public duty doctrine, granted summary judgment to the City and we affirmed. *Prosser*, ¶ 9.

¶41 The District Court's reliance in Order I on *Prosser* is understandable considering *Gatlin-Johnson* had not yet been issued and the District Court believed it was appropriately applying the public duty doctrine and that an analysis of the "special relationship/detrimental reliance" as argued by APEC, was required. However, the District Court again relied on *Prosser* in Order II when it declined to reconsider its analysis after *Gatlin-Johnson* was issued. We conclude this was error.

¶42 While we acknowledge some similarities between the case before us and *Prosser*, there is a significant distinction between *Prosser* and the case at bar—that is, no one in *Prosser* argued that the public duty doctrine did not apply. The plaintiffs in *Prosser* asserted throughout the proceedings that the special relationship exception applied. The *Prosser* Court therefore decided the case on the issues that were before it. In the case before us, Sara expressly argued that the City had duties defined under other generally applicable principles of law that rendered application of the public duty doctrine erroneous.

¶43 Additionally, in *Prosser*, while the city officials processed Kennedy's paperwork, approved of her remodeling/re-commercializing plan, and later fielded irate phone calls from the plaintiffs, it does not appear that the city was actively involved in the design of the project, which was in essence a remodel of a restaurant. It did not voluntarily undertake

19

oversight of the construction, nor did it actively participate in the design and location of the remodeled building.

¶44    Conversely, in the case before us, the record reflects that the City reviewed numerous plans and drawings for Cedar Pointe over time. It imposed multiple conditions upon the developers, including the requirement that a bicycle and pedestrian trail system be constructed. It obligated the city manager to approve the design, location, and final construction of the trails. In executing these tasks, city officials made numerous site visits and ultimately instructed that the trail system be widened and extended in specified locations. The City conducted inspections of the trail system during and after the construction phase. As the District Court found—and the City does not contest via cross-appeal—"the City's involvement went beyond mere approval" of the project and in fact "the City appears to have taken an active role in deciding the location and layout of the trail system." (Opinion, ¶ 28.) Many of the City's actions were similar to those that would be typically undertaken by the architects, contractors, and engineers. Consequently, this case does not involve a uniquely governmental activity.

¶45    Additionally, the City did not distinguish for the public what was a bike path and what was a walking path. The paths were created by the same contractor and looked identical. Even the police officer who responded to Casey's accident wrote in his report that Casey was found on the south side of the "bike path." The record also reflects that numerous City

officials walked the path, some on multiple occasions,[3] and knew first-hand of the existence of a dangerous and ADA-non-compliant grade in a public walking path. Nonetheless, it "approved" the walking path without requiring that the path meet Code requirements.

¶46    During the discovery phase of this case, Kent asked the City to identify the standards and regulations the City relied upon while "reviewing, considering, [and] placing conditions upon and giving approval for the design of the path and trail system." The City responded that it relied upon Title 17 of the City Code and the City's adopted Standards for Public Works improvements. Columbia Falls Municipal Code 17.14.030 disallows subdivided land with "slopes equal to or greater than twenty-five percent subsidence," recognizing that building on such a slope could cause environmental degradation or "be detrimental to the health, safety or general welfare of existing or future residents." Moreover, the Standards for Public Works improvements Section 2.05 (E) required: "Bicycle Paths and/or Walkways: Access-ways for people to use with non-motorized vehicles, primarily for recreational use, the minimum width shall be 9 feet, all slopes and grades shall meet ADA requirements." It is apparent however that the City did not require the owner, the contractors, or engineers to redesign the City-required public walking path to conform to ADA grade standards.

¶47    In arguing the District Court's ruling should be affirmed, the Dissent discusses, among other cases, a recent Utah Supreme Court case, *Cope v. Utah Valley State College*, 342 P.3d 243 (UT 2014). In *Cope*, a dance student was injured while rehearsing a choreographed dance routine that required her dance partner to lift her to his shoulder as she

---

[3]    It appears that William Shaw, the city manager, was on site at least five times during the pre-construction and construction phases of the project and that Lorin Lowry, the Director of Public Works, visited the site frequently and delivered site-related information to Shaw.

completed a back flip. *Cope*, ¶ 4. Although the move proved to be a challenging one, the school did not provide the usual spotters to help protect the dancers as they learned a new lift. In fact, the instructor told the students to use "more power" and try again. He told the couple he would drop the lift from the routine if they were unable to perform it. In their third attempt, Cope's partner lost his footing, and Cope fell and was injured. *Cope*, ¶ 5. She sued the college which moved for summary judgment on the grounds that it owed no duty to protect her. The motion was granted and Cope appealed. *Cope*, ¶¶ 7-8.

¶48    The Utah Supreme Court conducted an in-depth analysis of whether the dance instructor's action was an "affirmative action" or an "omission." The court noted that if Cope's accident arose from an "affirmative action" taken by the college, the public duty doctrine would not apply to her claim. However, if her claim arose from an omission, the public duty doctrine may present a bar to liability. *Cope*, ¶ 34. The court concluded that Cope could "trace her harm back to an affirmative act by UVSC"; therefore, the public duty doctrine did not bar her claim. *Cope*, ¶ 39. The Utah court explained that the college created, funded, and supervised the dance team, and gave students course credit for team participation. The court stated: "UVSC's actions in creating and overseeing the ballroom dance team had advanced to a stage where it had a duty to act in a reasonable manner to prevent injuries cause by participation with the dance team." In other words, "the college 'launched a force or instrument of [potential] harm'" and assumed a duty to act reasonably. *Cope*, ¶ 36.

¶49    The Dissent distinguishes this case from *Cope*, concluding that Sara "has done nothing to show that the City created the dangerous grade on the walk path." To the

contrary, as was the case in *Cope*, Sara's claim is premised upon affirmative actions taken by the City. As the District Court found, the City did not merely approve the walkway; it took an active role in monitoring, determining, and approving the engineering aspects of the trail system. It walked the walkway and gave instruction on the design. Having undertaken this active role, the City assumed a duty to act reasonably. *Cope*, ¶ 36.

¶50 The City argues it had no duty to Sara. However, it has long been the rule in Montana that should one gratuitously assume to render a service, the entity so doing is "bound to the exercise of reasonable care in the performance of the services so voluntarily assumed." *Vesel v. Jardine Mining Co.*, 110 Mont. 82, 92, 100 P.2d 75, 80 (1939). *See also Nelson*, ¶ 37 ("[O]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all. . . . The rule has been applied in several Montana cases where this Court has imposed a duty of reasonable care in the performance of an undertaking."). Thus, as Sara has alleged, the jury could find the violation of a duty voluntarily assumed.

¶51 In *Verity v. Danti*, 585 A.2d 65 (R.I. 1991), the Rhode Island Supreme Court was asked whether the public duty doctrine applied to a case where a child was seriously injured as a result of a blocked sidewalk. While walking along a sidewalk the child encountered a large tree that blocked her passage. A stone wall abutted the tree on one side and her only way around the tree was to step off the sidewalk and onto a busy highway. In doing so, she was hit by a vehicle and seriously injured. The State claimed it was protected by the public duty doctrine but the Rhode Island Supreme Court disagreed. The court concluded that the State knew of the sidewalk obstruction and consciously decided not to remove the obstacle,

23

thereby forcing pedestrians into peril. In fact, the court noted that the State had evaluated the condition of the sidewalk with the obstacle and concluded that it was "satisfactory." The Rhode Island court called the State's decision "egregious" and held "when the state has knowledge that it has created a circumstance that forces an individual into a position of peril and subsequently chooses not to remedy the situation, the public duty doctrine does not shield the state from liability."

¶52    The same result is compelled here. Evidence sufficient to defeat summary judgment exists that the City was actively involved in the design of the path, knew of its dangerous grade, had the statutory authority to compel a modification, and yet exercised its statutory and contractual authority to approve it. We conclude that the City could be held liable to Sara should Sara establish her claims premised on violation of statutory duty and/or the voluntary assumption of a duty to act with ordinary care. We therefore conclude that the District Court erred in barring Sara's claims on the basis of the public duty doctrine.

## CONCLUSION

¶53    Having concluded that the District Court erred in applying the public duty doctrine to the case at bar, we reverse the District Court's entry of summary judgment for the City and remand for a trial on the merits.

/S/ PATRICIA COTTER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT

24

Justice Patricia Cotter concurs.

¶54  I write separately to suggest that it is time to reconsider and rein in the application of the public duty doctrine.

¶55  Article II, Section 18 of the 1972 Montana Constitution provides: "The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature." In 1973, the Montana legislature enacted § 2-9-102, MCA, which provides: "Every governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties whether arising out of a governmental or proprietary function except as specifically provided by the legislature under Article II, section 18, of The Constitution of the State of Montana."

¶56  The legislature also defined what constituted a "claim" against a governmental entity in § 2-9-101(1), MCA, as follows:

> "Claim" means any claim against a governmental entity, for money damages only, that any person is legally entitled to recover as damages because of personal injury or property damage caused by a negligent or wrongful act or omission committed by any employee of the governmental entity while acting within the scope of employment, *under circumstances where the governmental entity, if a private person, would be liable to the claimant for the damages under the laws of the state.*

(Emphasis added.)

¶57  After the passage of the 1972 Constitution and the foregoing laws, the Montana legislature "reinstated limited governmental tort immunity by excepting from liability certain discretionary acts of public officials and placing caps on damage awards. *See* Title 2,

25

Chapter 9, Part 1, Montana Code Annotated (1977)." *Massee v. Thompson*, 2004 MT 121, ¶ 76, 321 Mont. 210, 90 P.3d 394 (Nelson, J., dissenting). Among the legislative exceptions was immunity for acts or omissions of legislators, including local governmental entities given legislative powers by the state such as school boards. Section 2-9-111(1)(b), MCA (1977). Subsequently, and at the urging of various county and state agencies, this Court in a series of decisions extended tort immunity to various governmental entities. *Massee*, ¶ 76 (Nelson, J., dissenting). As Justice Nelson observed in his *Massee* dissent, the 1991 legislature ultimately undertook to limit the terms under which governmental entities enjoyed statutory immunity by amending § 2-9-111, MCA, so as to preclude legislative immunity in those instances where administrative actions are undertaken in the execution of a law or public policy. *See generally*, Justice Nelson dissent in *Massee*, ¶¶ 67-96, addressing sovereign immunity, legislative action, and the development of the public duty doctrine.

¶58    As observed by Justice Nelson, the public duty doctrine can trace its inception in this state to *Annala v. McLeod*, 122 Mont. 498, 504, 206 P.2d 811, 814-15 (1949), in which the Court concluded that the Sheriff would not be held liable for damages sustained to a homeowner's property during a riot. In doing so, the court followed the precepts set forth in *South v. Maryland*, 59 U.S. 396, 15 L. Ed. 433 (1856), in which the Supreme Court concluded that the duty of a sheriff to keep the peace is a public duty which would be punishable only by indictment. *South*, 59 U.S. at 403. (*Massee*, ¶ 80.) Subsequently, we decided *Phillips v. Billings*, 233 Mont. 249, 253, 758 P.2d 772, 775, (1988), in which we concluded that the general duty of a police officer to protect the public "does not give rise to

26

liability for a particular individual's injury absent a greater duty imposed by a special relationship."

¶59 The foregoing cases did not reference the term "public duty doctrine"; however, they clearly laid the groundwork for its adoption in Montana. Montana first formally recognized the "public duty doctrine" in *Nelson v. Driscoll*, 1999 MT 193, 295 Mont. 363, 983 P.2d 972. In *Nelson*, we addressed the duty of care owed by a police officer to an intoxicated woman whom he stopped for DUI but then released with instructions that she not drive home. Subsequently, while walking along the icy shoulder of a roadway, she was struck and killed by a motorist. Citing *Phillips*, this Court for the first time addressed the "public duty doctrine" and the exceptions to the doctrine that survive in our case law to this day. Notably for purposes of this discussion, in identifying the four circumstances that would establish a special relationship so as to take the case outside of the doctrine, we said, quoting *Phillips*: "An exception to the public duty doctrine arises when there exists a special relationship *between the police officer and an individual* giving rise to [sic] special duty that is more particular than the duty owed to the public at large." *Nelson,* ¶ 22 (emphasis added).

¶60 In addressing the public duty doctrine and the four exceptions thereto, we cited the history of the doctrine, quoting *Phillips* for the proposition that "a police officer has no duty to protect a particular individual absent a special relationship." *Nelson*, ¶ 21. We cited cases from other jurisdictions and treatises which expressed the policy that "a police officer's duty to protect and preserve the peace is owed to the public at large and not to individual members of the public." *Nelson*, ¶ 21 (citations omitted). Thus, when we adopted the "public duty doctrine" we did so in the limited context of its application to law enforcement

27

officers. It was a "special relationship" between a police officer and a member of the public that invited liability exceptions under particular circumstances, and not a "general" relationship between a government bureaucrat and a member of the public.

¶61 Since *Nelson*, we have referenced the doctrine frequently in cases involving the interaction of law enforcement officers and particular plaintiffs. *See, e.g., Massee, Nelson v. State,* 2008 MT 336, 346 Mont. 206, 195 P.3d 293, and *Gonzalez v. City of Bozeman,* 2009 MT 277, 352 Mont. 145, 217 P.3d 487. Where we have gone wrong, I submit, is in expanding the sweep of the public duty doctrine to encompass all manner of general government conduct.

¶62 In joining Justice Regnier's special concurring opinion in *Massee,* I signaled my agreement with Justice Nelson's analysis and conclusion that it is difficult to sustain the public duty doctrine in light of Article II, section 18 of the Montana Constitution, which abolished sovereign immunity. However, I agreed with Justice Regnier's observation that the doctrine might arguably be preserved in the context of the exercise of discretion by law enforcement officers. However, we left that discussion to "another day," as the abolishment of the doctrine was not critical to the outcome of the *Massee* case. *Massee,* ¶ 100.

¶63 Here, the plaintiff has not advocated for the partial or complete abolishment of the public duty doctrine. I therefore write separately in the hopes that "another day" will come soon. As the argument and citations contained in Justice Baker's dissent underscore, the public duty doctrine has morphed from a doctrine born and intended to apply only to the actions and decisions of law enforcement, into one that is applied to a broad swath of governmental actions and omissions. In our zeal to protect governments from negligence

liability, we have expanded the doctrine well beyond its intended limitations, and in so doing have ignored not only Article II, section 18, but also the clear language of §§ 2-9-101 and -102, MCA, which hold every governmental entity subject to liability for torts under circumstances in which that entity, if a private person, would be liable to the claimant for damages. We have also ignored that provision of § 2-9-102, MCA, which directs that any exception to the foregoing rule must be approved by the legislature by a 2/3 vote of each house. Because the legislature has largely eliminated and declined to statutorily resurrect governmental immunity for torts, I believe we have erred in expansively reviving that immunity by resort to a judicially-created theory. For these reasons, I for one would welcome in a future case a thorough re-examination and review of the viability of the public duty doctrine.

/S/ PATRICIA COTTER

Justice Michael E Wheat joins the concurrence.

/S/ MICHAEL E WHEAT

Justice Beth Baker, dissenting.

¶64    In order to withstand a motion for summary judgment in a negligence action, the plaintiff must establish that the defendant owed her a legal duty. *Debcon, Inc. v. City of Glasgow*, 2001 MT 124, ¶ 29, 305 Mont. 391, 28 P.3d 478. Public and private defendants are dissimilarly situated for purposes of establishing legal duty. Unlike private parties, government touches nearly all aspects of organized life, and we expect the government to act to serve the community as a whole and not individual interests. "Juries and courts are ill-

equipped to judge 'considered legislative-executive decisions' as to how particular community resources should be or should have been allocated to protect individual members of the public." *Morgan v. Dist. of Columbia*, 468 A.2d 1306, 1311-12 (D.C. Cir. 1983) (citation omitted). If the government does not fulfill its duties, the law provides avenues of recourse outside the courtroom. In light of the differences between public and private action, unmitigated negligence liability has the capacity to expose governments to ceaseless litigation and interfere with government discretion about how best to use limited resources to benefit the public. *Prosser*, ¶ 18. The public duty doctrine exists in recognition of these dangers and differences.

¶65   The public duty doctrine holds that an absolute duty that the government owes to the public at large does not establish a legal duty, does not expose the government to negligence liability, and does not provide a plaintiff the right to maintain a negligence action. *Nelson*, ¶ 21. Unless the government is liable under a generally applicable principle of law, such as premises liability, *Gatlin-Johnson*, ¶¶ 17-18, our law is well-established that liability may be found only when the government has established a special relationship with the plaintiff— whether through specific protective statutes, specific protective actions, actions that reasonably induce detrimental reliance, or through a custodial relationship with the plaintiff or a third person. *Nelson*, ¶ 22.

¶66   In *Prosser*, we considered the applicability of the public duty doctrine to land use decisions—specifically, approval of a change in use of a commercial building and enforcement of a condition to that approval. *Prosser*, ¶ 12. These decisions were made under local municipal codes intended to benefit the general public. *Prosser*, ¶ 23. We held

that the government owed no legal duty to the plaintiffs in that case, in part because to hold otherwise would force the government "either to deny all but the most benign development plans or face innumerable lawsuits." *Prosser*, ¶ 27.

¶67 The case before us presents the question of the applicability of the public duty doctrine to another land use decision intended to promote the general welfare—approval of a planned unit development. *See* Columbia Falls Municipal Code at 17.04.030. As we stated in *Gatlin-Johnson*, *Prosser* recognizes the public duty doctrine's applicability to government actions involving "land use decisions by a local government body." *Gatlin-Johnson*, ¶ 15. The Court's decision today, holding that the public duty doctrine does not apply to a land use decision by a local government body, conflicts directly with *Prosser*.

¶68 The Court appears to find something novel or unique about the City's use of a planned unit development as a land use regulation tool. But planned unit developments, like zoning amendments and variances, are normal land use regulation tools, their approvals are matters committed to the judgment of local officials, and they are used to further the welfare of the general public. Additionally, use of a planned unit development may be appropriate in situations in which an amendment and variance is not: planned unit developments can serve public goals by increasing flexibility, creativity, variety, and efficient use of open space in land development projects. *See* 3 Josh Martinez, *Local Government Law* § 16:17, at 16-44 through 45 (2nd ed. 2014). They can achieve this because, by the very nature of a planned unit development, a "local government exercises more precise control than would otherwise be theoretically possible when acting upon a request for a map or text amendment." *Local Government Law* § 16:17, at 16-44 through 45.

31

¶69    The Court's apparent concern with this greater level of control, Opinion, ¶¶ 43-44, misses the point that such control is inherent in planned unit developments, which are simply tools for land use regulation to serve the general welfare. Land use regulation is exclusively a governmental function and exclusively a creature of statute. *See generally* § 76-2-101 through -340, MCA. A private actor does not undertake land use regulation, so there is no principle of law applying generally to both the government and private actors that imposes a legal duty on the government during land use regulation.

¶70    The Court's focus on the City's "active involve[ment]" in this case overstates the evidence and overlooks the parallels with *Prosser*. Like Kent, the *Prosser* plaintiffs claimed that a government defendant facilitated a harm-causing instrumentality. *Prosser* concerned the City of Hamilton's approval of the change in property use of a fast-food restaurant to a casino and lounge. *Prosser*, ¶¶ 5-6. Before the approval, neighbors to the property raised their concerns (mostly regarding the noise and light pollution that the change would portend) with the city. Nonetheless, the city approved the building modification on the condition that it "comply with all federal, state and local laws." The casino was built. *Prosser*, ¶ 6. The neighbors then sued the city for its role in promoting and facilitating the very problems that the city had considered in first approving the project (noise and light pollution) and for failing to enforce its condition to the project's approval. *Prosser*, ¶¶ 7-8.

¶71    The Court apparently concludes that, unlike in this case, the city's involvement in *Prosser* was not "active involve[ment]" because it did not "voluntarily undertake oversight of the construction, nor did it actively participate in the design and location of the remodeled building." Opinion, ¶ 43. The harm-causing instrumentality in *Prosser* was not the design

32

and construction of the building; it was the use of the land for a casino. The City of Hamilton's "active involve[ment]" in approving that use directly facilitated the instrument of harm. Yet Hamilton was protected by the public duty doctrine because its action was taken pursuant to state law and city ordinances that were enacted "to benefit the general public." *Prosser*, ¶ 23.

¶72 The harm-causing instrumentality in this case is the grade of the trail. Columbia Falls was not "actively involved" with determining the trail's grade. The City's interest in the portion of the trail where the accident occurred was simply that it connect properties that otherwise were not adjacent to a sidewalk. Touching a sidewalk is normally a requirement to development in Columbia Falls, but, at the developer's proposal, the City waived that requirement so long as a private trail system connected properties without a sidewalk. In fact, the City Manager specifically told Cedar Pointe's developer that that the City had no expectation regarding the slope of the private walk path. Opinion, ¶ 8. The District Court found that the City appeared "to have taken an active part in deciding the *location and layout* of the trail system." (Emphasis added.) What the City did in this case—requiring, as a condition to waiving the requirement that sidewalks connect all properties, that a private path connect properties, and having government employees walk the path to determine that it fulfilled that specific condition—did not make the City the private path's engineer, responsible for creation of the path's slope.

¶73 It is not entirely accurate to say, as the Court suggests, that "no one in *Prosser* argued that the public duty doctrine did not apply." Opinion, ¶ 42. In fact, though framed differently, the plaintiffs in *Prosser* offered arguments nearly identical to Kent's that the

33

public duty doctrine should not apply to a city's allegedly negligent exercise of its statutory land use authority. While Kent frames her argument in terms of a generally applicable principle of law exempting the doctrine's application, the *Prosser* plaintiffs framed their arguments in terms of a special duty exempting the doctrine's application.[1] But, in light of the reasons for the public duty doctrine, the land use regulation exemplified in the City's oversight of a planned unit development is precisely the type of context in which the public duty doctrine does apply. Development of real property almost always requires a local government's oversight, regulation, and either tacit or explicit approval. Today's decision, which situates local governments as the insurers of private developers, thus risks innumerable lawsuits and burdening the discretion of governments to use their limited resources to advance the general welfare.

¶74 The Court also places special "focus" on our opinion in *Gatlin-Johnson*, Opinion, ¶ 22, concluding that it was error for the District Court to decline "to reconsider its analysis" after that case was decided, Opinion, ¶ 41. While acknowledging that *Gatlin-Johnson* did not create new law, Opinion, ¶ 39, the Court relies on *Gatlin-Johnson*'s recognition that the public duty doctrine "does not apply where the government's duty is defined by other generally applicable principles of law." *Gatlin-Johnson*, ¶ 17. But, as the Court observes, *Gatlin-Johnson* simply stated the terms of the public duty doctrine consistent with how we

---

[1] *See, e.g.*, Brief of Plaintiffs and Appellants, *Prosser v. Kennedy Enter., Inc.*, S. Ct. No. DA 06-0073, at 7 ("There exists a 'special relationship' between the Occupants and the City which has given rise to a special duty that is more particular than the duty owed to the public at large *which prevents the application of the public doctrine to Occupants in this case*."); at 13 ("The special duty owed by the City to the Occupants *prevents the application of the public duty doctrine* to bar Occupant's claims against the City in this case.") (original emphases removed and new emphases added).

had stated them in the past: the doctrine "applies only if the public entity truly has a duty to the public at large." *Gatlin-Johnson*, ¶ 17.

¶75    In *Gatlin-Johnson*, we identified a single generally applicable principle of law that imposes a legal duty on government and renders the public duty doctrine inapplicable: premises liability. *Gatlin-Johnson*, ¶¶ 18-20. That conclusion was grounded in numerous Montana cases that did not apply the public duty doctrine in negligence actions stating a claim for premises liability against a government entity. *Gatlin-Johnson*, ¶¶ 18-19. We explained that premises liability is a generally applicable principle of law because, with premises liability, "the government entity, if a private person, would be liable to the claimant for the damages under the laws of the state." *Gatlin-Johnson*, ¶ 19 (quoting § 2-9-101(1), MCA). Our recognition that the government often has a legal duty outside the public duty doctrine when acting as a landowner was nothing new. *See Cooley on Torts* § 450, at 238 (4th ed. 1932) (noting that when municipal corporations act as "artificial persons" owning and managing property, "they are chargeable with all the duties and obligations of other owners of property, and must respond for creating or suffering nuisances under the same rules which govern the responsibility of natural persons"). Clearly, however, premises liability is not the theory on which the Court relies to impose a duty on the City in this case. After all, the City did not own, maintain, control, design, engineer, or construct the path where the tragic accident in this case occurred. The District Court accordingly concluded that premises liability did not apply, and Kent has not appealed that conclusion.

¶76    The Court relies in part on the Rhode Island case *Verity*, Opinion ¶ 51, but *Verity* does not purport to state a generally applicable principle of law. Rather, the Rhode Island court in

*Verity* recognized an exception to the public duty doctrine when the government "has created a circumstance that forces an individual into a position of peril and subsequently chooses not to remedy the situation." *Verity*, 585 A.2d at 67 ("abrogat[ing]" the public duty doctrine in Rhode Island when governmental negligence is so "extreme" or "egregious" that "to bar suit . . . would effectively excuse[] governmental employees from remedying perilous situations that they themselves created"); *see Berman v. Sitrin*, 991 A.2d 1038, 1044 n.7 (R.I. 2010) (describing *Verity* as recognizing an "exception" to the public duty doctrine "when the governmental entity acts in an egregious manner"); *Haley v. Lincoln*, 611 A.2d 845, 849 (R.I. 1992) (describing the "'egregious conduct' exception to the public duty doctrine first delineated by this court in *Verity*"). The exception recognized in *Verity* is particular to government actors; it is therefore not generally applicable.[2]

¶77 The Court states nonetheless that the "same result" is compelled in this case as in *Verity* because "the City was actively involved in the design of the path, knew of its dangerous grade, had the statutory authority to compel a modification, and yet exercised its statutory and contractual authority to approve it." Opinion, ¶ 52. Once again, this "statutory authority" derives not from a principle of law generally applicable to public and private actors alike, but from the City's role in land use regulation. The Court concludes that, by its

---

[2] Although not explicitly stated in *Verity*, it also appears that the defendant government agency in that case maintained and controlled the property on which the danger that caused the plaintiff's injury was found. *See Verity*, 585 A.2d at 65-67. Rhode Island, like Montana, recognizes an exception when the governmental entity acts as a landowner. *Adams v. R.I. Dep't of Corr.*, 973 A.2d 542, 546 (R.I. 2009); *see Gatlin-Johnson*, ¶ 20; *Kaiser v. Town of Whitehall*, 221 Mont. 322, 325, 718 P.2d 1341, 1343 (1986) (imposing on a government defendant a legal duty owed to those "travelling on a public sidewalk"). But the case on appeal is not a premise liability case. The City did not own, maintain, or control the path. The District Court accordingly determined that premises liability does not apply in this case. Kent has not appealed that determination.

active involvement under the guise of this authority, the City voluntarily assumed a legal duty to regulate the slope of the private path. Opinion, ¶ 50. In contrast to a gratuitous service, however, the City acted pursuant to statute and under the "more precise" exercise of control inherent in the review of a planned unit development. *Local Government Law* § 16:17, at 16-44 through 45. *Compare Vesel*, 110 Mont. at 92, 100 P.2d at 80 (applying duty of reasonable care to gratuitous service rendered "in the absence of a statutory or contractual obligation"). Put simply, the City was not acting as a "good samaritan." *See Nichols v. Block*, 656 F. Supp. 1436, 1446 (D. Mont. 1987).

¶78 Without expressly saying so, the Court suggests a new exception to the public duty doctrine where the government engages in affirmative acts that give rise to the dangerous circumstance causing a plaintiff's injury. Opinion, ¶¶ 46-49. This concept is not new to the law. As stated by Judge Cardozo:

> If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward.

*H.R. Moch Co., Inc. v. Rensselaer Water Co.*, 247 N.Y. 160, 167 (1928). *See also Sult v. Scandrett*, 119 Mont. 570, 573, 178 P.2d 405, 407 (1947). The Utah Supreme Court recently embraced this theory, ruling that the public duty doctrine "does not immunize the State from liability for affirmative acts that harm a plaintiff." Instead, the doctrine "is limited to situations where a plaintiff seeks to impose liability for a duty to protect the general public from external harms." *Cope*, ¶ 2. The Utah court distinguished situations where the government actor does not create the plaintiff's peril—in which the public duty doctrine

would shield the government from liability—from those in which "the affirmative acts of a public employee actually cause the harm" and the public duty doctrine does not apply. *Cope*, ¶ 24. *See also Cooley on Torts*, § 450, at 241-42 (noting that a city is not liable for failure to abate a nuisance, "although it may be held liable for a nuisance created and maintained by it").

¶79     Kent has done nothing to show that the City created the dangerous grade on the walk path.[3] The Utah court's analysis in *Cope* explained that "governmental actors are also not liable for a defective effort to perform a public duty to ameliorate an externally caused harm." *Cope*, ¶ 24 n.5 (citing as an example a case in which the City of Salt Lake was shielded by the public duty doctrine when it took various measures to combat flooding that proved inadequate to protect the plaintiff's property). Therefore, even under an "affirmative acts" exception, Kent's allegations against the City fail. In both *Verity* and *Cope*, the government actor *created* the dangerous condition. Here, the Court seems to recognize that the City did not create the slope when it states, "It is apparent" that the "City did not require the owner, the contractors, or engineers" to lessen the grade of the private path. Opinion, ¶ 46. No party argues in this case that the City *created* the peril that caused Casey Kent's injury.

¶80     Absent facts showing that the City "launched a force or instrument of [potential] harm," Opinion, ¶ 48 (quoting *Cope*, ¶ 36), the concepts on which the Court relies already

---

[3] Though Kent pleaded a claim for willful or wanton misconduct, the District Court rejected that claim as "merely a species of negligence, utilized in a premises liability action." Kent has not appealed that ruling. In any event, Kent's claim for willful or wanton misconduct does not allege that an affirmative act by the City created the peril that caused the accident in this case.

38

are subsumed in the established exceptions to the public duty doctrine. Both Kent and the Court have not argued and have implicitly conceded that the City's acts or omissions do not bring this case within any of the recognized exceptions.

¶81 With respect to the City's "statutory duty," our case law makes clear that the public duty doctrine applies to a government entity under circumstances where a statute imposes a duty to the public at large. For instance, in *Nelson v. State*, 2008 MT 336, 346 Mont. 206, 195 P.3d 293 (*Doris Nelson*), the plaintiff alleged "that the State negligently and in violation of statute" issued a medical license to a doctor whose alleged malpractice played a role in the death of the plaintiff's decedent. *Doris Nelson*, ¶¶ 9-10. We applied the public duty doctrine. *Doris Nelson*, ¶ 50. Similarly, in *Prosser*, where the government defendant had the statutory authority to reject the proposed change in use, we applied the public duty doctrine. *Prosser*, ¶ 22. If neither the statutory authority to deny a doctor a license nor the statutory authority to deny a land use change creates a legal duty outside the public duty doctrine, the statutory authority to reject a planned unit development does not, either.

¶82 Further, it is unquestionable that the statutes in this case do not meet the special relationship exception for statutes intended to protect from harm a specific class of persons of which the plaintiff is a member. The City approved the planned unit development under the statutory authority provided to it by the state "[f]or the purpose of promoting health, safety, morals, or the general welfare of the community." Section 76-2-301, MCA. The Court seems to suggest that the City negligently enforced its municipal ordinance disallowing "slopes equal to or greater than twenty-five percent subsidence," but this ordinance's purpose is to protect the "general welfare"—not private individuals of which the

plaintiff is a member. Opinion, ¶ 46 (citing Columbia Falls Municipal Code 17.14.030).[4] A private person would not be "liable to the claimant for the damages under the laws of the state," *Gatlin-Johnson*, ¶ 19, for failing to exercise the statutory authority under which the City approved the planned unit development. Nor do Kent's allegations meet the exception for application of the public duty doctrine when the government has taken affirmative steps to protect a specific individual from harm. *See Nelson*, ¶ 38.

¶83    In the acknowledged absence of the inapplicability of any exception to the public duty doctrine, it appears that the only basis for imposing a legal duty on the City in this case is a general duty of ordinary care, applying to the City's actions enforcing its land use code provisions. Opinion, ¶ 50. But imposing a legal duty on this basis does not comport with precedent in which we have applied the public duty doctrine to government actions enforcing statutes that a governmental entity is charged with administering. For instance, in *Gonzalez*, the plaintiff claimed that police officers acted negligently in responding to an emergency call (leading to her rape), and negligently arrested her at the scene of the crime (causing her severe emotional distress). *Gonzalez*, ¶ 19. The plaintiff argued that she was a foreseeable victim of emergency response acts exercised without due care. *See* Brief for Appellant, *Gonzalez v. City of Bozeman*, S. Ct. No. DA 08-0566, at pg. 11 ("The question of whether the officers owed [the plaintiff] a duty of care also depends upon the foreseeability that she would be injured by their conduct."). Yet we analyzed this case under the public duty doctrine and its exceptions. *Gonzalez*, ¶ 20.

---

[4] The Court does not explain why this municipal ordinance matters, considering the facts show that the slope of the path where the accident occurred was under twenty-five percent. Opinion, ¶ 1.

¶84 We have proceeded similarly in many other cases in which the government was alleged to have been negligent in enforcing or following pertinent statutes, and found a legal duty only where a special relationship brought the case within an exception to the public duty doctrine. *See Eklund v. Trost*, 2006 MT 333, ¶ 32, 335 Mont. 112, 151 P.3d 870 (not applying a general duty of due care to police conduct during a high speed chase and instead imposing a duty only after finding a special relationship); *Orr v. State*, 2004 MT 354, ¶ 47, 324 Mont. 391, 106 P.3d 100 (not applying a general duty of due care to state enforcement of mine regulations and instead imposing a duty only after finding a special relationship); *Massee v. Thompson*, 2004 MT 121, ¶ 44, 321 Mont. 210, 90 P.3d 394 (not applying a general duty of due care to sheriff's deputies' enforcement of a domestic abuse statute and instead imposing a duty only after finding a special relationship); *Nelson*, ¶ 40, (not applying a general duty of due care to a police officer's failure to restrain a drunk driver and instead imposing a duty only after finding a special relationship). The Court does not consider these cases.

¶85 Our law on when a government defendant owes a duty in a negligence suit is not and need not be as baffling as today's decision makes it. Consistent with our precedent, the first step in the Court's analysis should be to ask whether the City truly owes a duty to the public at large in executing its authority under the land use regulation statutes and ordinances. Consistent with *Prosser*'s conclusion and *Gatlin-Johnson*'s affirmation that the public duty doctrine applies to land use decisions, we should answer that question in the affirmative. We should next ask whether Kent has identified a generally applicable principle of law that otherwise would impose a legal duty on the City in this case. Kent has failed to identify such

a principle. Then, we should examine the special relationship exceptions to the public duty doctrine. Kent has not argued that any special relationship exception applies. Accordingly, I would affirm the District Court's order. I dissent from the Court's contrary decision.


/S/ BETH BAKER


Justice Jim Rice and Justice Laurie McKinnon join in the dissenting Opinion of Justice Baker.


/S/ LAURIE McKINNON
/S/ JIM RICE